## RUDOLPH KRAUS V. STATE OF NEBRASKA.

### FILED APRIL 11, 1922.   No. 22087.

1  **Criminal Law: TEST OF INSANITY.** The test of insanity, urged as a defense to a charge of crime, is the capacity of the accused to understand the nature of the act committed and his ability to distinguish between right and wrong with respect to it.

2.  ———: **INSANE DELUSION.** Where a person is so diseased in mind, at the time the act is charged to have been committed, that he is incapable of comprehending the nature of the act and is unable to distinguish between right and wrong with respect to it, he is not accountable, howsoever such insanity may be manifested, whether by insane delusion or in any other manner.

3.  ———: ———. In case of partial insanity only, an insane delusion, which raises in the mind of the accused an imagined state of facts and so corrupts his mental processes that he is incapacitated from distinguishing right from wrong with respect to the act charged, is a defense, though the imagined state of facts, if real, would not have justified a sane man in doing the same act.

4.  ——— ———. Where there is evidence that the accused was, in committing the act charged, laboring under an insane delusion, but was sane on matters not connected with the subject of his delusion, it cannot be presumed, as a matter of law, that he is able to reason with regard to the subject-matter of his delusion, the same as a sane man would as to a state of actual facts conforming to the imaginings of the accused.

5.  ———: ———: **QUESTION FOR JURY.** The question of the effect of an insane delusion to incapacitate a person, who is otherwise sane, in his ability to distinguish between right and wrong, with regard to matters connected with his delusion, is always a question for the jury, and an instruction on insane delusions should call upon the jury to pass upon that question.

6.  **Instruction on insane delusions,** being instruction No. 3, given in the case of *Thurman v. State*, 32 Neb. 224, and criticized in *Taylor v. State*, 86 Neb. 795, is disapproved and *held*, in the form given, to be erroneous.

ERROR to the district court for Saline county: RALPH D. BROWN, JUDGE. *Reversed.*

*Bartos & Bartos,* for plaintiff in error.

*Clarence A. Davis, Attorney General,* and *Jackson B. Chase, contra.*

Heard before DEAN, ROSE, DAY and FLANSBURG, JJ.

FLANSBURG, J.

Criminal prosecution for murder. Defendant was convicted of murder in the first degree and appeals. This is the second time the case has made its appearance in this court. The facts, as disclosed by the evidence upon this trial, are substantially the same as at the former hearing and are fully set out in the former opinion. *Kraus v. State,* 102 Neb. 690.

The question presented now is as to the instruction on insanity.

The expert testimony in the defendant's behalf was that the defendant was a paranoiac, and that his condition was due to the continued and excessive use of alcoholic liquors. The testimony of the defendant, borne out by the testimony of disinterested witnesses, was to the effect that he had, for a long period of time, been obsessed with an insane delusion that he and his entire family were afflicted with tuberculosis. Shortly prior to the act charged, the defendant drank considerable quantities of liquor and arrived home near midnight. He was, as his testimony shows, unable to sleep and walked about in the yard under a great mental stress, harassed with the fancy that his wife and children, whom he had just seen sleeping in the house, had blood running from their mouths and were seriously afflicted with the disease mentioned. He climbed upon the windmill, with the intention of casting himself off, but was unable to do so. He heard voices calling to him that if he left this world he should take his wife and children with him. He said: "I listened, it may be from God, * * * I don't see nobody." He believed that he could not kill himself and leave his wife and children suffering from disease; he thought best that they should all go together and that he should kill them. He went into the bedroom where they were sleeping, and as they slept shot

Kraus v. State.

each one in turn through the temple, first his wife, then his little four-year-old girl, and then his son, two years of age. The boy moved and defendant shot him again through the body. He then removed them, one at a time, kissing them as he did so and placing them side by side upon the floor. He left a place for himself between the two children and, lying down there, shot himself through the temple, severing the optic nerve and permanently blinding him. He then shot himself in the forehead and then through the body. Still living, he groped along the wall, leaving bloody stains from his hands, endeavoring to reach a shelf where he kept his razor, but swooned away, and the bodies were found in the positions mentioned, the accused still unconscious, the next day. It appears that the defendant had had no marital difficulties of any kind, and that he loved his wife and children, and the only motive that could be ascribed for his act, except that of insanity, was his intoxication and discouragment over farming affairs and over the condition of his prospective wheat crop.

The testimony of disinterested witnesses, as well as the testimony of experts, was to the effect that the defendant was insane; that he labored under the delusion mentioned, and that he was unable to distinguish right from wrong, with reference to his act.

The court did not instruct specifically as to the test by which the jury should be guided in determining the sanity or insanity of the accused, that test being, under our decisions, the capacity of the accused to understand the nature of the act committed, and the ability to distinguish between right and wrong, with respect to it. *Schwartz v. State,* 65 Neb. 196; *Philbrick v. State,* 105 Neb. 120. The court did, however, give the following instruction:

"You are instructed that, there being some evidence introduced in this case relative to the mental condition of the defendant at and prior to the time of the commission of the crime charged, it devolves upon the state to prove by competent evidence, beyond a reasonable doubt, that at the time of the commission of the crime charged the

defendant was of sound mind and was mentally competent to distinguish right from wrong with respect thereto. If, from all of the evidence, or the lack of evidence, a reasonable doubt is raised in your minds as to the sanity of the defendant at the time of the commission of the crime charged, it is your duty to find the defendant not guilty on the ground of insanity."

The instruction, so given, does not, as it appears, strictly define the term insanity, as fixed by the above decisions, and, though we do not approve of this as an instruction, it is not for that reason that the instruction is set out, but only for the purpose of showing its connection with the other instruction on insanity which follows. The two instructions were all that were given by which the jury were enabled to determine the issue of insanity. The other instruction is as follows:

"Evidence has been introduced in this case about hallucinations and delusions. It is not every hallucination or delusion that can be considered an insane hallucination or delusion. In order to be an insane hallucination or delusion the hallucination or delusion must be of such a character that if things were as the hallucination or delusion imagined them to be they would justify the act springing from the hallucination or delusion.

"So, in this case, if you find from the evidence that, at the time of the killing charged in the information, the defendant was laboring under the hallucination that he was commanded by the voice of God to shoot his wife, and if you also find from the evidence that the defendant believed in God, and he was moved by such hallucination, and by that alone, to shoot his wife, that would have been an insane hallucination, because, if true, it would have justified the killing.

"But. if you find from the evidence that at the time of the killing the defendant was laboring under the delusion that his wife had tuberculosis and because of that fact it would be best to kill her and that delusion moved the defendant to kill his wife, that would be no excuse for the

act on the ground of insane delusion, because if the fact had really been that his wife had tuberculosis it would not have justified the killing."

The instruction is confusing in its definition of an insane hallucination or delusion. It seems to declare that an hallucination or delusion is not attributable to insanity unless it is of such a kind as would justify the act which springs from it. An insane delusion is a false belief, springing from a mind disordered by disease, and may be defined entirely apart from the acts of the party afflicted which are the result of such delusion. It is the product of a diseased mind, as distinguished from errors of judgment or imagined conditions in a healthy mind which are brought about by processes of reasoning. It is not generated by reason or reflection, and it cannot be dispelled by them. The person afflicted has no control over it, and the images of his mind are to him facts from which he cannot escape. The effect of that portion of the instruction was to tell the jury that defendant was not insane unless his acts were justified.

Counsel for defendant complains bitterly of the latter paragraph of the instruction, and it is this paragraph which clearly presents the vital question in the case. By it the jury are instructed that, though the defendant was acting under the insane delusion that his wife was afflicted with tuberculosis and, impelled by that delusion, thought that it was best that she should be killed, such a delusion would not constitute a defense, for the reason that, had the imagined facts, springing from the delusion, been real, they would not have been a justification for taking life.

It is to be noted that the instruction does not refer to partial insanity. It is not expressly limited to insane delusions of persons who are otherwise, except for such delusion, found to be sane, but covers all insane delusions generally. It, furthermore, does not require, should it be found that the defendant was afflicted with an insane delusion but was, as to other matters, sane, that the jury inquire into or determine the question of fact as to whether

or not such delusion so corrupted defendant's mental processes that he had become incapacitated from distinguishing right from wrong, with respect to the act which he committed. It is true that in some cases the rule of partial insanity has been arbitrarily stated to be that, where a person is otherwise sane, except for an insane delusion, he cannot rely, for a defense, upon the delusion unless the facts which he falsely imagines to be true were of such a nature that, if they had been true, they would have legally justified his act. 16 C. J. 101, sec. 76. In some of those cases it seems to be assumed, as a matter of law, that, where a person has an insane delusion but is sane on other matters not connected with his delusion, he is able to reason, the same as if sane, with respect to the subject-matter of his delusion, except that he is allowed to assume that his false imaginings are true. Whether or not a person, having an insane delusion, who is impelled to act by reason of that delusion, is able to distinguish the difference between right and wrong, with respect to his act, it seems to us, must be determined as a question of fact in each particular case, and, therefore, that the jury must in all cases, where the defense of insanity, either partial or total, is presented, be required to determine whether or not the accused, at the time he committed the act, understood its nature and comprehended that it was wrong. The rule announced in some jurisdictions, that a person who is partially insane is presumed, as a matter of law, to be able to reason with regard to the imagined facts, the same as a sane person, has developed from a declaration of law in *McNaghten's Case*, 10 Clark & Fin. (Eng.) *200. McNaghten, charged with homicide, had been acquitted on the ground of insanity. The defense of insanity was new, and a debate arose in the House of Lords as to the question of the nature and extent of the unsoundness of mind which would be sufficient to excuse a crime. Five questions were propounded to the justices, calling for answers in the nature of abstract propositions of law. Preliminary to answering the questions, Mr. Justice Maule

remarked (p. *204) :

"I feel great difficulty in answering the questions put by your Lordships on this occasion: First, because they do not appear to arise out of, and are not put with refer- ence to, a particular case, or for a particular purpose, which might explain or limit the generality of their terms, so that full answers to them ought to be applicable to every possible state of facts, not inconsistent with those assumed in the questions; this difficulty is the greater, from the practical experience both of the bar and the court being confined to questions arising out of the facts of particular cases; secondly, because I have heard no argument at your Lordships' bar or elsewhere on the subject of these questions; the want of which I feel the more, the greater are the number and extent of questions which might be raised in argument; and, thirdly, from a fear, of which I cannot divest myself, that as these questions relate to matters of criminal law of great importance and frequent occurrence, the answers to them by the judges may embarrass the administration of justice, when they are cited in criminal trials."

One of the questions, in substance, inquired as to the defense of partial insanity to a charge of crime when, at the time of the commission of the crime, the accused knew that he was doing wrong, but did the act with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury or of producing some supposed public benefit. The answer was that, where there was only partial insanity, the accused, laboring under the partial delusion, must be considered in the same situation, as to responsibility, as if the facts, in respect to which the delusion existed, were real. But the premise for that answer was that the accused, in committing the act, though he had been driven to it by his delusion, comprehended at the time that he was doing wrong, Mr. Justice Maule stating (p. *205) :

"There is no law, that I am aware of, that makes persons in the state described in the question not responsible

for their criminal acts. To render a person irresponsible for crime on account of unsoundness of mind, the unsoundness should, according to the law as it has long been understood and held, be such as rendered him incapable of knowing right from wrong."

And Lord Chief Justice Tindal, in his answer, stated (p. *209) that, "notwithstanding the party accused did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some public benefit, he is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law."

In that case the justices manifestly had in mind, and so expressed themselves, that, where a person was laboring under an insane delusion, he should be treated as if the matter of the delusion existed in fact, but that, if he still was not wholly insane but was able to comprehend and distinguish the difference between right and wrong, with respect to the act committed, then the fact of delusion would not be a defense unless the imagined facts were sufficient to justify him as a sane man.

In some of the decisions, and, we believe, with a proper interpretation of the rule in *McNaghten's Case,* the courts have stated that the rule as to insane delusions is simply a different manner of stating the rule generally with regard to the defense of insanity (*Cunningham v. State,* 56 Miss. 269), and that in all cases the element cannot be eliminated which requires the jury to pass upon the question whether the accused understood the nature of the act and was able to distinguish between right and wrong with respect to it. Whether or not a person suffering from insane delusions is yet, by reason of his sanity on other subjects, able to distinguish between right and wrong, with regard to the subject-matter as to which he is insane, is a question of fact, to be passed upon by the jury. An instruction, therefore, in a case presenting the defense of partial insanity, which states that a person having an in-

sane delusion cannot justify his act unless the facts imagined, if true, would have justified a sane man, and leaving out the question as to whether or not the delusion so perverted and affected the accused's mind as to incapacitate him from determining whether or not his act is right or wrong, does not sufficiently present the issue to the jury. *Ryan v. People,* 60 Colo. 425; *Oldham v. People,* 61 Colo. 413; *Parsons v. State,* 81 Ala. 577; *State v. Jones,* 50 N. H. 369; *State v. Keerl,* 29 Mont. 508; *Hotema v. United States,* 186 U. S. 413. See note, L. R. A. 1917F, 646.

In criticism of the rule that, as a matter of law, an insane delusion in a case of partial insanity is not a defense unless the imaginary facts are such as, if real, would justify or excuse the act, the court in *State v. Jones, supra,* said (p. 387):

"The doctrine thus promulgated as law has found its way into the text-books, and has doubtless been largely received as the enunciation of a sound legal principle * * * yet it is probable that no ingenuous student of the law ever read it for the first time without being shocked by its exquisite inhumanity. It practically holds a man confessed to be insane, accountable for the exercise of the same reason, judgment, and controlling mental power, that is required of a man in perfect mental health. It is, in effect, saying to the jury, the prisoner was mad when he committed the act, but he did not use sufficient reason in his madness. He killed a man because, under an insane delusion, he falsely believed the man had done him a great wrong, which was giving rein to a motive of revenge, and the act is murder. If he had killed a man only because, under an insane delusion, he falsely believed the man would kill him if he did not do so, that would have been giving rein to an instinct of self-preservation, and would not be a crime. It is true, in words, the judges attempt to guard against a consequence so shocking, as that a man may be punished for an act which is purely the offspring and product of insanity, by introducing the qualifying phrase, 'and is not in other respects insane.' That is, if insanity pro-

duces the false belief, which is the prime cause of the act, but goes no further, then the accused is to be judged according to the character of motives which are presumed to spring up out of that part of the mind which has not been reached or affected by the delusion or disease. This is very refined. It *may be* that mental disease sometimes takes a shape to meet the provisions of this ingenious formula; or, if no such case has ever yet existed, it is doubtless within the scope of omnipotent power hereafter to strike with disease some human mind in such peculiar manner that the conditions will be fulfilled; and when that is done, when it is certainly known that such a case has arisen, the rule may be applied without punishing a man for disease. That is, when we can certainly know that, although the false belief on which the prisoner acted was the product of mental disease, still, that the mind was in no other way impaired or affected, and that the *motive* to the act did certainly take its rise in some portion of the mind that was yet in perfect health, the rule may be applied without any apparent wrong. But it is a rule which can be safely applied in practice, that we are seeking; and to say that an act which grows wholly out of an insane belief that some great wrong has been inflicted, is at the same time produced by a spirit of revenge springing from some portion or corner of the mind that has not been reached by the disease, is laying down a pathological and psychological fact which no human intelligence can ever know to be true, and which if it were true, would not be *law*, but pure matter of fact. No such distinction ever can or ever will be drawn in practice; and the absurdity as well as inhumanity of the rule seems to me sufficiently apparent without further comment."

And the court in *Parsons v. State, supra,* said (p. 595) that, if that rule be correct, "it necessarily follows that the only possible instance of excusable homicide in cases of delusional insanity would be, where the delusion, if real, would have been such as to create, in the mind of a reasonable man, a just apprehension of imminent peril to life

or limb.   The personal fear, or timid cowardice of the insane man, although created by disease acting through a prostrated nervous organization, would not excuse undue precipitation of action on his part.   Nothing would justify assailing his supposed adversary except an overt act, or demonstration on the part of the latter, such as, if the imaginary facts were real, would, under like circumstances, have justified a man perfectly sane in shooting or killing.   If he dare fail to reason, on the supposed facts embodied in the delusion, as perfectly as a sane man could do on a like state of realities, he receives no mercy at the hands of the law."

The instruction, complained of in this case, is, as we have said, not premised upon the fact of partial insanity. It does not assume that the jury must find that the accused was sane in every respect, except as to the delusion, and that in that event the delusion would not be a defense unless the imaginary facts, if true, would have justified the act; nor does it call upon the jury to determine whether or not the accused, if found to be laboring under the insane delusion that his wife was diseased, and that it was best that she should be killed, had sufficient mental capacity to distinguish between right and wrong, with respect to the act committed; but the instruction, on the other hand, inflexibly adheres to the rule that, as a matter of law, an insane delusion cannot be a defense to a criminal charge in any case, unless the imaginary facts, if true, would have justified a sane man to do the killing.   It seems to us that the instruction was clearly erroneous and prejudicial. The evidence in the case very strongly points to the conclusion that the accused was insane, and he was entitled to have that defense fully protected.

The instruction in this case is based in part upon the rule as announced in the case of *Thurman v. State,* 32 Neb. 224.   This court in *Taylor v. State,* 86 Neb. 795, 807, declared that it did not approve of the instruction given in the *Thurman* case, but did not discuss the reasons. The instruction given in the case of *Walker v. State,* 46 Neb.

25, also given in the case of *Taylor v. State, supra* (quoted 86 Neb. 814), on insane delusions, did submit to the jury the question of whether or not the defendant had "at the time a degree of reason sufficient to control his actions and judgment," and the ability "to distinguish between right and wrong with respect to the act charged." So far, then, as the rule, stated in the case of *Thurman v. State, supra,* is contrary to this opinion, it is overruled.

The judgment of the district court is reversed, and the cause remanded for further proceedings.

REVERSED.