## Horn v. Commonwealth.

Dec. 11, 1942.

J. M. Wolfinbarger for appellant.

Hubert Meredith, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

At the trial of appellant, Bill Horn, in the Estill circuit court on an indictment charging him with murdering his nephew, Orville Horn—who was sixteen years of age—he was found guilty by the jury of voluntary manslaughter and punished by confinement in the penitentiary for two years. His motion for a new trial was overruled, and from the verdict and judgment pronounced thereon he prosecutes this appeal, urging only two grounds of alleged errors committed by the trial court which counsel contend are sufficiently prejudicial to authorize a reversal of the judgment. They are (1) that his defense of insanity was uncontradictedly established, and for which his motion for a directed verdict of acquittal should have been sustained, and (2) error of the court in giving the voluntary manslaughter instruction, since counsel argues that if his client was guilty at all, it was of the offense of murder, and that there is no testimony authorizing a reduction of the degree of homicide to voluntary manslaughter. A disposition of both grounds requires a brief statement of the facts as disclosed by the evidence.

Appellant was a bachelor some 42 years of age. He resided alone on a small farm owned by him in Estill county in a two room log cabin on Buck Creek. At a close distance to his cabin home lived his brother, Walker Horn, who was the father of the deceased. The brother had children of both sexes, some of the females having married and with their husbands lived in the same immediate vicinity. Three of the sons of Walker Horn were the deceased, an older brother, named Roy Horn, and a younger one below the age of 10 years named Allie. The homicide occurred between four and five o'clock p. m. on Saturday, November 2, 1940. Appellant had for a number of years indulged his appetite for liquor, and frequently went on sprees of more or less protracted intoxication—after which he would sober up and become entirely normal. His testimony discloses that he possessed, perhaps, above average intelligence, thereby enabling him to express himself succinctly and intelligently. According to his testimony he had been on one of his sprees prior to the preceding Tuesday before the homicide, but he claimed that since the evening of that day he had con-

sumed no liquor. While in his cabin on Friday night preceding the killing of his nephew he said that he thought he saw and heard Roy Horn with some others (including the deceased) in his yard outside of his residence plotting against his life; but he did not claim that any of them so threatened him, except his nephew, Roy, whose voice he said he recognized, although the proof shows that Roy at that time was in Woodford county and had been there for as much as a month. After the hearing of the plotting of Roy, who was with the others, against him he procured his shot gun and sat some little time in his front living room next to the road in front of his house. Finally he concluded to leave his home and go to that of his nearby brother-in-law, Arthur Metcalf, which he did, stopping on the way at the residence of a closer neighbor, Otis Wells. After spending a short while with him, both he and Wells went to the home of Metcalf. He stated to both of those witnesses what he claimed to have heard at his house, and that Roy, with his other conspirators, had pursued him part of the way, but they did not overtake him.

Wells left the home of Metcalf and returned to his home, but appellant spent the night in the Metcalf residence and the latter took him to the office of Dr. B. S. Broadduss in Irvine the next day. The physician examined him and gave him some prescriptions for nervousness, after which appellant and his brother-in-law returned to the latter's home and appellant later went from there alone to his home. Between four and five o'clock Clyde Brandenburg and the deceased were passing appellant's home returning from a hunting trip, each of them carrying a shot gun. They concluded to stop at the home of appellant for a short while and upon approaching the cabin door Brandenburg called out "Oh, Bill, where are you?" To which the appellant answered: "Here in the house." When they started to enter the cabin the appellant said: "Come in here." They found him in possession of his gun and the two hunters unloaded their guns and set them against the wall of the cabin, each of them still standing up. After they entered the cabin appellant asked: "Have you seen Roy and the other boys anywhere?" To which they gave a negative answer.

Immediately following such brief conversation appellant arose from his chair and looked out of a window

and then returned, when the deceased asked him what kind of a gun he had, receiving from appellant an answer that it was a "20-gauge Stevens." Appellant then looked at Brandenburg and turned around in front of his deceased nephew, then raised his gun and shot the nephew, producing a wound from which he immediately died. The gun of appellant was a breach loading single barrelled one carrying only one cartridge. After the shooting, according to Brandenburg, deceased unbreached his gun and took the empty cartridge from it, when Brandenburg made his escape and went to the home of Walker Horn, the father of the deceased and reported to him what had occurred.

Upon receiving that information the father of deceased immediately went to the home of appellant and asked him: "Where is Orville"? receiving the answer "He's in the house. I killed him." The father did not enter the cabin of appellant because the latter appeared at the front door with his gun in his hand and forbade him entering it. After the shooting and following the departure of Brandenburg, appellant remained in his house for a short while and then went alone to the home of his brother-in-law, Metcalf, carrying his gun with him; but somewhere along the trip he thought (as he said) that Roy Horn and Brandenburg were following him and he fired one or two shots in their supposed direction. He also carried along with him on that trip a pocket full of cartridges with which he had supplied himself beforehand.

On being asked "Why did you shoot Orville?" he answered: "I shot him because I thought Roy was on the outside with a gun and I figured that they were all going to join in together." On cross-examination he was asked: "You did not think the boy (deceased) would shoot you did you?" To which he answered: "Well I thought by him coming in with that gun that he was going to side in with Roy."

The physician in giving his testimony related no conversation with appellant, nor described any act of his during and throughout the visit to his office, and in describing the condition of his patient he said: "Yes, he seemed to be nervous, and, as I remember it, kindly uneasy like he thought something was going to happen to him, or something like that." He was then asked if appellant made any statement in his presence with refer-

ence to the likelihood of anyone hurting him, to which the witness answered by saying: "I do not remember." The witness then stated—without reciting any conversation or acts of appellant—that he thought the latter possibly did not know right from wrong and "That he was crazy when he was in my office." From the foregoing recitation of the facts it is strenuously insisted that the testimony established beyond cavil or controversy the insanity of appellant to the degree of exonerating him from all guilt for his homicidal deed. Clearly, appellant was either drunk at the time (but which he denies) or he was laboring under the after-effects of a spree, usually denominated as delirium tremens.

Much wrestling with the question as to the force and effect that should be given to voluntary intoxication as an excuse for or amelioration of the commission of a crime committed when the accused is intoxicated, has been indulged by courts in the enforcement of the criminal law; also much has been written as to the degree of insanity, howsoever produced, that will excuse a defendant charged with crime from punishment therefor. A partial list of domestic cases and text authorities dealing with the two questions of intoxication and insanity are: Tyra v. Commonwealth, 2 Metc. 1; Shannahan v. Commonwealth, 8 Bush 463, 8 Am. Rep. 465; Harris v. Commonwealth, 183 Ky. 542, 209 S. W. 509; Thomas v. Commonwealth, 196 Ky. 539, 245 S. W. 164; Weick v. Commonwealth, 201 Ky. 632, 258 S. W. 90; and Richardson v. Commonwealth, 284 Ky. 319, 144 S. W. (2d) 492. Text authorities dealing with the defense of insanity are 16 C. J. page 98, beginning with section 71 et seq., and in the same volume on page 104, section 81 is the beginning of the discussion of the effect of intoxication of the accused; 22 C. J. S., Criminal Law, section 55 et seq., and section 66. See, also, 14 Am. Jur., page 788, et seq., beginning with section 32.

There are many other cases wherein the two questions and their defensive effect are discussed, declared and applied, referred to in the cases and texts above listed; but in all of them it is held that if a crime is committed when the accused is in a state of intoxication resulting from his voluntary consumption of alcohol, the utmost effect that might be given to his condition in such circumstances would be to ameliorate his punishment where the crime charged consisted of degrees, or the

punishment was graded and left to the discretion of the jury.

In the discussions with reference to the defense of insanity the universal holding is, that the insanity of the accused must be such as deprives him of ability to determine right from wrong, and to not comprehend the effects of his act, or that he was powerless to control an impulse to commit the deed. Therefore, though the accused became afflicted with delirium tremens it would not constitute a complete defense for his crime, unless it deprived him of ability to comprehend the nature and consequence of his act, or to know that it was wrong, or that he was led to its commission by an impulse which he was powerless to control although "Many courts refuse to recognize the 'irresistable impulse doctrine' as a test of criminal responsibility, and require that the 'right and wrong' test be complied with before the accused may be excused." A long list of cases are cited in the notes to the text from which the excerpt was taken (14 Am. Jur. 793, section 36).

The reader's attention is also called to the annotation in 70 A. L. R. page 659, where the annotator exhaustively reviews the condition of the law upon the subject of "Irresistable Impulse" as an excuse for crime, and on page 675 is the beginning of a long list of cases from a great number of states repudiating the irresistable impulse doctrine. The authorities also agree on the proposition that delirium tremens is a form of insanity. See 14 Am. Jur, page 790, and 16 C. J. 109, section 86; 22 C. J. S., Criminal Law, section 70. If, therefore, the temporary insanity produced by delirium tremens is not to the degree or extent of temporarily depriving the accused of knowledge of right or wrong, or the ability to comprehend the effects of his act in committing the crime, then his condition would not furnish a total defense. Under the heading of "Insane Delusions and Partial Insanity" in 16 C. J. 101, the text says: "In other words, when a person is under an insane delusion or hallucination, although he is rational on other subjects, the rule is that he is not responsible criminally for acts committed under the influence of such delusion or hallucination, where the fact or state of facts existing in his imagination would, if actually existing, justify or excuse the act. But where the imaginary facts, if real, are not such as would justify or excuse the act, it is no

defense that it was committed under an insane delusion.''
See, also, 22 C. J. S., Criminal Law, section 60.

Applying the facts of this case to the universally
enunciated rules supra, we are of the opinion that ap-
pellant was not entitled to an acquittal on the ground
of insanity. While no motive existed for his homicidal
deed, there is an entire failure of proof to show that
in committing it he was deprived of reason, or that he
did not know right from wrong, or was ignorant as to
the consequences of the means he employed and the re-
sult that would happen. He brought about the result he
intended. In applying the last excerpt from 16 C. J. to
the facts of this case we find that if we should admit as
facts the imaginations of appellant at the time he com-
mitted the homicide to be true, yet they would furnish
no defense. His imagination, as related by him, con-
cerned chiefly his nephew, Roy, and when his slain
nephew, Orville, came to his home on the fatal occasion
appellant did not claim that he made any demonstration
or uttered any threat containing potential danger to ap-
pellant's life, nor did he so imagine. The nephew had
disarmed himself in the presence of appellant by plac-
ing his gun against the wall after unloading it in appel-
lant's presence. Nothing whatever happened there to
show that appellant was in the slightest danger from
either Brandenburg or appellant's nephew. Therefore,
if all other preceding imagined facts by appellant were
actualities his slaying of his nephew would not be ex-
cusable on the grounds of self-defense, or any other
justifiable ground. The court gave a proper instruction
on insanity, which is not objected to and which has been
approved by this court in many opinions. The other in-
structions are without fault, and there remains only the
other error complained of, i. e., the giving of the volun-
tary manslaughter instruction.

But little need be said with reference to it, since in
a number of the cited domestic cases supra, as well as
in all texts to which we have had access a voluntary man-
slaughter instruction is proper under the facts disclos-
ed by this record on the ground that defendant's con-
dition, howsoever produced, may have been such as to
deprive him of the necessary element of malice, or malice
aforethought essential to create the crime of murder,
and it is for that purpose that the courts, without excep-
tion so far as we are aware, declare that in such condi-

tions the voluntary manslaughter instruction should be given. The jury in this case no doubt entertained pity for the unfortunate defendant and gave him the lowest punishment for a lower degree of homicide than murder, and we have been unable to discover any error authorizing us to reverse the judgment.

Wherefore, it is affirmed.