THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FREDERICK J. LECHNER, Defendant-Appellant.

First District (2nd Division) No. 61157

Opinion filed February 3, 1976.

HAYES, J., specially concurring.

James J. Doherty, Public Defender, of Chicago (Richard D. Kharas, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Linda Ann Miller, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendant, Frederick J. Lechner, was charged with the murder of his wife, Betty Lechner, and one Richard Taylor. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(a)(2).) Following a bench trial, defendant was found guilty of murder for both homicides and was sentenced to serve in the penitentiary a term of not less than 14 nor more than 30 years.

Defendant appeals from these judgments and presents the following contentions: (1) the trial court erred by denying a lay witness the opportunity to express an opinion regarding defendant's mental state at the time of the homicides; and (2) both convictions must be reversed because defendant presented sufficient evidence to shift the burden to the prosecution to prove beyond a reasonable doubt that defendant was legally sane at the time the homicides were committed, and the prosecution failed to sustain this burden.

On November 30, 1971, defendant called his office at Talman's Savings and Loan and advised that he would not be coming to work. At approximately 4 or 5 p.m., that afternoon, defendant was in Ron's Tap, a tavern located in Chicago. As he departed from the tavern, defendant told one

Stanley Lakas that he was going to visit his wife, Betty Lechner. The Lechners had been living apart since October 15, 1971, and Betty had been residing with her sister, Gertrude Samborski, since about the first week in November.

On the evening of November 30, 1971, defendant twice telephoned the Samborski home to speak with Betty, but was informed that she had not returned from work. Gertrude testified that defendant sounded "quite angry" during the second telephone call. At 7:50 p.m. that evening, Gertrude observed defendant drive by her home and look into the driveway.

At approximately 8:25 p.m., Betty Lechner, accompanied by Richard Taylor, drove into the driveway adjacent to the Samborski residence. As Gertrude approached the back door to meet Betty, she heard two or three sounds which she thought were "backfires of a car." When she opened the door and turned on the light, she heard voices and observed Betty get "out of the car as if Fred pulled her out." Defendant was holding a "silver" gun. After Betty told defendant that "she still loved him and didn't care what anybody else said," defendant replied he "was tired of her lying, her bullshit." Defendant then shot Betty, firing approximately three shots. Although Gertrude did not observe defendant shoot Taylor, it was stipulated that defendant caused both deaths.

Defendant returned to Ron's Tap at approximately 9 p.m. and informed Stanley Lakas that "I have just killed those people." Defendant was taken into custody later that evening and was described by the arresting officers as "loud," "profane," and "obviously drunk." The weapon which was used to slay the victims was recovered from Ron's Tap.

While Betty was living with Gertrude, defendant came to visit his daughter two or three times. On each occasion, defendant came alone, stayed for about four hours, and never created a disturbance. During this period, defendant telephoned the Samborski residence almost nightly, usually talking to Gertrude. Gertrude testified that although defendant sometimes sounded intoxicated, he never cried during their conversations. In a few of these telephone conversations, defendant expressed his belief that Betty was pregnant by Richard Taylor. The witness further testified that defendant repeatedly threatened to kill Betty, his daughter, Taylor, and Taylor's children. He also warned that "he would get all of us." Defendant reasoned that "if he couldn't have her, nobody else was going to have her * * *."

Two days before the homicides occurred, Gertrude overheard defendant arrange to call Betty on Tuesday (the day of the shootings), and Betty was to inform him at that time of her intentions with respect to their marriage.

The "affirmative defense of insanity" was adduced by defendant as follows:

The secretary for defendant's supervisor testified that on one morning in early November, 1971, defendant came to work "crying in an uncontrollable way, and shaking quite badly." Defendant stated that his wife had left him. Defendant's supervisor also observed defendant's condition. Defendant was taken to a hospital where he was treated with tranquilizing medication. The attending physician, Dr. Roche, considered defendant's condition to be normal, but "nervous, and sort of mixed up, that's all." Defendant spent the evening at home and returned to work the next morning.

Prior to this occasion defendant's job performance at Talman's since he commenced employment there in January of 1971 was described as "very good," "very stable," and "did not miss a day of work." Thereafter, defendant continued his perfect attendance, but he experienced three or four crying spells each day, interspersed with periods of recovery. The secretary had never seen a man cry like defendant, and defendant's supervisor had never observed such a depressive condition. Defendant continued to work at his appointed tasks, but he was not assigned additional duties because of his condition.

Dr. Roche saw defendant on a professional basis on a few occasions subsequent to defendant's initial hospital visit. After a suicide threat by defendant, Dr. Roche examined defendant and advised him to consult a psychiatrist. It was the witness' belief, as is common in instances of threatened suicide, that defendant was dangerous to himself and required professional counselling. Although Dr. Roche did not employ his training in psychiatry when examining defendant, it was his opinion that there was "something wrong" with defendant and that defendant was "mentally disturbed."

Defendant's aunt testified that defendant moved to Chicago from a small town in Wisconsin at the age of 17, subsequently entered into his first marriage which ended in divorce, and then married Betty. His second marriage lasted nearly 10 years. She further related that during 1970, defendant reacted severely to the deaths of his parents and an aunt. In November of 1971, defendant came to the witness' house and was very upset and emotional, claiming that his wife had left him. During this visit, defendant gave his aunt two shotguns and a revolver because "he didn't trust himself." He then collapsed, but was "coming out of it a little" by the time the fire department arrived. During Thanksgiving dinner at the witness' home, defendant brooded and cried and stated that his wife was "running around with" another man with whom she worked.

Dr. Marvin Ziporyn, a psychiatrist, examined defendant in the county jail for 45 minutes in July of 1972. He testified that as a result of that examination, it was his opinion that defendant was competent to stand trial. However, during the examination, he found defendant to be extremely agitated, unable to address himself to questions, and responding in a "very circumstantial fashion." In addition, defendant manifested marked respiratory signs, teared when discussing emotionally charged material, appeared restless and hyperactive, and had marked tremors throughout the examination.

Based upon this examination, Dr. Ziporyn opined that defendant suffered from "agitated depression," a psychoneurotic condition in which there is no departure from reality in terms of thinking processes, but in which "swings in mood and feeling" are exhibited. This form of "mental illness" is characterized by depression, sleeping and working difficulties, frequent weeping, and suicidal tendencies. When this depressive condition becomes agitated, the above symptoms are accompanied by tension, hyperactivity, and often panic states, in which the individual "loses his control of himself, and acts beyond the ability or capacity of his brain to control his actions." In response to a hypothetical question predicated upon the facts of this case, it was Dr. Ziporyn's opinion that the hypothetical man appreciated the criminality of his conduct, but as a result of a mental disease, he was unable to conform his conduct to the requirements of the law. The witness further explained that the personality displayed by the hypothetical man was such that the basic family structure was of paramount importance to him and that his need for dependence gratification was continually unsatisfied due to the loss of loved ones, either by death or divorce.

In rebuttal to the evidence presented by defendant to establish the defense of insanity, the prosecution adduced the following evidence:

Defendant's mother-in-law testified that she had about four conversations with defendant between the date her daughter left defendant, October 15, and the date on which the shootings occurred, November 30. During this period, defendant did not appear depressed to this witness, and she did not observe defendant crying or undergoing any personality changes.

Betty's brother and sister-in-law both testified that they had seen defendant twice and once respectively during November of 1971 and had not noticed anything unusual about defendant's behavior during the month preceding the shootings. On all the several occasions, however, Betty had been with defendant. The brother also testified that defendant had related his marital difficulties to him.

Gertrude, Betty's sister, testified that during many of the telephone

conversations she had with defendant, he told her that he had been following Betty and her employer, Richard Taylor; that he had observed them embracing and kissing; that a female coworker of Betty and Taylor had told defendant that Betty was pregnant by Taylor; and that he had hired a private detective to follow them. The witness had never seen Betty and Taylor embrace, nor did she have knowledge of a romantic involvement between them. Although she had observed defendant "angry and shoving Betty around" at a party on November 14, 1971, she had never seen defendant cry or black out, or otherwise behave in an unusual manner.

Linda Taylor, widow of Richard Taylor, testified initially as a defense witness and related that she knew Betty Lechner who was her husband's secretary and they would give each other rides to work. They were not romantically involved. Linda Taylor as a State rebuttal witness related that defendant told her that her husband and Betty Lechner were having an affair. Defendant told her that he had hired a detective to follow her husband and Betty Lechner and that he was going to get some photographs from the detective. The witness did not believe that a detective had been hired, but she testified that defendant was able to tell her the date and the flight when she made a trip to Washington and the date she returned.

Dr. Edward Kelleher testified as the prosecution's expert medical witness. He examined defendant on July 28, 1972 pursuant to court order. In response to a hypothetical question formulated from the facts in this case, Dr. Kelleher was of the opinion that "based upon a reasonable degree of medical certainty," the hypothetical man was not suffering from a mental disease on November 30, 1971, and had the capacity to conform his conduct to the requirements of the law. One factor which the witness found particularly influential was that "neurosis is rather persistent and requires treatment once it comes on," whereas in the hypothetical question, "there is evidence that he [the hypothetical man] recovered rapidly and assumed normal behavior." Dr. Kelleher thus characterized the condition depicted by the hypothetical question as "an emotional reaction rather than a neurotic depression." He stated that the hypothetical man exhibited an "explosive-passive-aggressive" personality disorder, but not a mental disease.

On cross-examination, Dr. Kelleher replied that the hypothetical man might be delusional if his beliefs that his wife was romantically involved with and pregnant by her employer and that he had hired a private detective to follow them were not based upon facts other than his own declarations as to what he had done or had observed or had been told. The witness testified that if the hypothetical man was delusional, then

he would be suffering from a mental disease which would render him unable to conform his conduct to the requirements of the law. However, in addition to the possibility that the hypothetical man was delusional, it could also be theorized that either he did not have enough facts at his disposal when he reached these conclusions, or that he was making an emotional attempt to become reunited with his wife. Based upon all of the facts contained in the hypothetical question, it was this expert's opinion that the hypothetical man was not delusional.

The defense called Dr. Robert Reifman to testify as an expert medical witness in surrebuttal to the prosecution's evidence on the issue of defendant's sanity on November 30. Dr. Reifman, in addition to Dr. Kelleher, was approved by the trial court to perform a psychiatric examination of defendant. In his report filed with the court following his examination of defendant on July 28, 1972, Dr. Reifman concluded that "[a]s a result of the examination, it is not possible to substantiate a finding of legal insanity." When a hypothetical question was posed describing the history and behavior in evidence concerning defendant, the witness responded that there was insufficient information in the question to enable him to arrive at an opinion on the hypothetical man's sanity. He further stated that additional information was needed in order for him to make a determination of whether the hypothetical man was delusional. On cross-examination, Dr. Reifman explained that "it's possible for a man to appreciate the difference between right and wrong, and the criminality of his act, and to be laboring under a delusion," although it is slightly more probable that such a person would be legally insane.

Upon this evidence, defendant was found guilty of the murder of both his wife and Taylor. Defendant urges reversal of these convictions by first arguing that the trial court committed reversible error by not allowing a qualified lay witness, defendant's supervisor, to express his opinion as to defendant's mental condition at the time of the homicides. Defendant contends that this ruling had the effect of depriving him of a fair opportunity to fully and completely present his defense of insanity.

Defendant's supervisor testified with respect to defendant's behavior and job performance both before and during the time in which defendant and his wife were living apart. The witness observed defendant on numerous occasions throughout this period. Defense counsel then asked the witness if, based upon his observations of defendant, he had an opinion on whether defendant was "suffering from some sort of a disability or impairment or illness or abnormal condition" during the 30-day period prior to the shootings. The prosecution's objection to this question was sustained, with the trial court ruling: "I don't think he can answer that, he hasn't sufficient medical knowledge to render such

a decision. He can merely testify to defendant's conduct." Thereupon, defense counsel concluded his direct examination of this witness.

Defendant argues that the testimony of this witness culminating in the question to which objection was made clearly demonstrates that this witness, as a nonexpert, was qualified to express his opinion regarding defendant's mental condition. Defendant places principal reliance upon *People v. Pruszewski*, 414 Ill. 409, 111 N.E.2d 313, and concludes that this ruling constituted error, that the error was so highly prejudicial that he was not granted a fair opportunity to fully present evidence in support of his defense of insanity, and that therefore, a new trial is required. Our conclusions with respect to this issue are contrary to those reached by defendant.

■■ In *Pruszewski*, our Supreme Court reiterated a well-established principle of law that "a nonexpert witness who has had an opportunity to observe the subject under inquiry may give his opinion as to his mental condition—at the same time stating the facts and circumstances as the basis for the opinion." 414 Ill. 409, 413, 111 N.E.2d 313, 315.

The factual situation in *Pruszewski* which prompted a reversal and remandment is clearly distinguishable from that presented in the instant case. In *Pruszewski*, several lay witnesses were permitted to express their opinions, over objection, that defendant was sane. But the entire testimony of defendant's brother was stricken with the trial court ruling that "he is not qualified as a witness to give an opinion * * *." Prior to expressing his belief that defendant was insane on the date the homicide was committed, this witness testified that defendant had related that he "heard voices," that defendant was known to walk around the block for long periods of time and that "about a day before this happened he lost his way and forgot where he lived," and that the witness awoke one morning to find defendant sleeping on a pillow which was "all cut up with a knife." This latter incident occurred just two days before defendant repeatedly stabbed his wife, causing her death. In the instant case, the lay witness was permitted to testify with respect to defendant's behavior during an 11-month period before the incident and was only prohibited from responding to one question.

■■ This action by the trial court did not constitute error. First, the question posed by defense counsel is objectionable since it exceeded the ambit of merely seeking a lay witness' opinion concerning the accused's sanity. Not only was this a leading question, but in order for a witness to give an accurate response, a certain level of medical knowledge and familiarity with psychiatric terminology would be required. Dr. Ziporyn referred to an "impairment of the cognitive ability" as being

one area which must be considered in order to determine the existence of mental disease. In addition, "abnormal" was the key word in Dr. Kelleher's definition of "mental disease." After this definition was elicited, a line of questioning followed which attempted to distinguish between "normal" and "abnormal" conduct. And Dr. Reifman testified that "[a] delusion indicates mental illness and impaired judgment." Thus, the question asked of this nonexpert witness was couched in terms subsequently used by expert witnesses in their testimony to describe various types and characteristics of mental illness. By selecting one of the four alternatives offered in the question, the lay witness could be attributing a mental illness to defendant without so intending. Consequently, the trial court properly ruled that this witness did not possess "sufficient medical knowledge to render such a decision."

■■■ Second, whether or not sufficient facts and circumstances have been testified to by a lay witness to serve as a foundation for that witness' opinion of the accused's sanity is primarily a question for the trial court to determine, and a reviewing court will not reverse this determination unless there has been an abuse of discretion. (*People v. Banks*, 17 Ill. App. 3d 746, 308 N.E.2d 261; *People v. Lassiter*, 133 Ill. App. 2d 353, 273 N.E.2d 166.) We do not consider the ruling at issue in the instant case to be the product of an abuse of discretion. This particular witness testified that defendant became very depressed after his wife left him, and that defendant's working effectiveness decreased accordingly. Although defendant related to this witness that "he couldn't go on much longer," the trial court could properly conclude that this witness had not observed conduct which was particularly unusual under the circumstances. Moreover, notwithstanding this ruling, defendant was not deprived of a fair opportunity to fully present his defense of insanity. The failure of this witness to express an opinion regarding defendant's sanity is not decisive of whether defendant's sanity was brought into issue since "if there are sufficient facts shown by the testimony, the absence of such opinion testimony is immaterial." *People v. Smothers*, 55 Ill. 2d 172, 175, 302 N.E.2d 324, 326.

Defendant's second contention is that the prosecution failed to sustain its burden of proving beyond a reasonable doubt that defendant was legally sane at the time the homicides were committed. (Ill. Rev. Stat. 1969, ch. 38, par. 3—2.) When evidence is introduced by an accused in order to relieve culpability for the charged offense, such an attempt raises an affirmative defense which is defined as follows:

> "(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental

defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the re-requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill. Rev. Stat. 1969, ch. 38, par. 6—2.

In a criminal proceeding, the accused is presumed to have been sane at the time he allegedly committed the charged offense. (*People v. Redmond*, 59 Ill. 2d 328, 320 N.E.2d 321; *People v. Lono*, 11 Ill. App. 3d 443, 297 N.E.2d 349.) The purpose of this presumption is to require the production of evidence which is sufficient to bring the accused's sanity into issue. Once this evidence is introduced, the presumption vanishes and the burden shifts to the prosecution to establish beyond a reasonable doubt that defendant was legally sane at the time of the occurrence. *People v. Redmond; People v. Lassiter.*

■■ We agree with defendant that sufficient evidence was adduced to bring defendant's sanity into issue. However, we hold that the prosecution sustained the burden which devolved upon it to establish defendant's sanity on November 30, 1971, beyond a reasonable doubt.

Although the evidence adduced on this issue was conflicting, our review of the record reveals ample competent evidence to support the trial court's finding. Defendant argues that he was so emotionally overcome upon seeing his wife with Taylor at the time of the incident that he was unable to conform his conduct to the requirements of the law, notwithstanding the possibility that he may have appreciated the criminality of his action. However, this theory ignores Gertrude's testimony that defendant repeatedy threatened to kill several persons, including his wife. Moreover, there was evidence that defendant threatened to kill his wife "every time they had trouble." Significantly, this latter testimony was based upon conversations with defendant occurring more than 3 years prior to the period in which defendant's sanity is now being questioned.

Defendant further maintains that an examination of the expert testimony, including that elicited from the prosecution's expert witness, uncovers a strong possibility that defendant was delusional at the time the homicides occurred. Again, we are not persuaded by defendant's argument. Dr. Kelleher stated that it was possible that defendant was delusional at the time of the shooting, but it was his expert opinion that defendant was not. And although there was insufficient information to enable Dr. Reifman to render an opinion on this matter, he testified that it was possible for a person who was laboring under a delusion to appre-

ciate the criminality of his actions and to conform his conduct to the requirements of the law. Furthermore, both of these witnesses offered theories that could explain defendant's behavior preceding the incident which was equally as conceivable, if not more so, as the possibility that defendant was delusional during this period.

Our Supreme Court has reached a similar holding when confronted with conflicting testimony on the sanity issue. In *People v. Ford*, 39 Ill. 2d 318, 235 N.E.2d 576, four police officers who talked with defendant after she was arrested testified that she was coherent, logical, in touch with reality, and in their opinion, able to appreciate the criminality of her conduct and to conform her conduct to the requirements of the law. Two doctors described defendant's confinement in a mental institution and considered her to be psychotic with a schizoid personality. Another expert witness diagnosed her condition as ambulatory schizophrenia, and it was this witness' opinion that at times defendant was legally insane. Three lay witnesses were of the opinion that defendant was insane on the date of the occurrence. The Supreme Court held that there was sufficient evidence for the jury to find beyond a reasonable doubt that defendant was sane at the time of the homicide. Similarly, in *People v. Myers*, 35 Ill. 2d 311, 220 N.E.2d 297, *cert. denied*, 385 U.S. 1019, 17 L. Ed. 2d 557, 87 S. Ct. 752, a finding of sanity was supported by the evidence, even though the testimony of five expert witnesses on this issue was conflicting.

■■ Defendant's final argument is that the "findings of the trial court constitute a paradigm of confused reasoning which, in and of itself, mandates a reversal of defendant's conviction." Although the findings of the trial court were to a degree confusingly stated, our examination of the testimony of the witnesses referred to in the findings, and in particular the examination of the expert witnesses convinces us that the trial court correctly concluded that the evidence established beyond a reasonable doubt that defendant was legally sane at the time of the homicides.

Accordingly, the judgment of the circuit court is affirmed.

Judgment affirmed.

LEIGHTON, J., concurs.

Mr. JUSTICE HAYES, specially concurring:

I concur with the opinion of the court. I wish, however, to develop the matter of an insane delusion as the specific mental disease or mental defect on the basis of which a defendant in a criminal prosecution interposes the affirmative defense of insanity at the time of the commis-

sion of the offense for which he is being prosecuted. I wish to do so because we have been cited to no Illinois case in which the insanity defense has been predicated upon an insane delusion as the specific mental defect or mental disease, nor have I been able to find any such Illinois case.

When, in a criminal prosecution, the defendant interposes the affirmative defense of insanity at the time of the commission of the criminal offense, the opinion of the court notes that the defendant must initially make a showing of his alleged insanity sufficient to rebut the presumption of sanity; if he does so, the State then has the burden of proving beyond a reasonable doubt that the defendant was legally sane at the time he committed the criminal offense. Ill. Rev. Stat. 1973, ch. 38, par. 3—2.

In the instant case, Dr. Ziporyn, a psychiatrist, testified for defendant as an expert witness in defendant's initial showing of insanity. Dr. Ziporyn had no occasion to deal with the matter of an insane delusion because, in response to defense counsel's hypothetical question, the doctor stated that it was his opinion that the hypothetical person was suffering from the mental disease of agitated depression which, while it did not impair his cognitive ability mentally to appreciate the criminality of his conduct, yet rendered him unable to conform his conduct to the requirements of the law because it rendered him unable to control his emotional impulses. In the doctor's opinion, the truth or falsity of defendant's suspicions as to the existence of a romantic relationship between his wife and Mr. Taylor and as to her pregnancy by him was irrelevant; granted that he entertained such suspicions or beliefs, the only relevant factor was his ability to control the emotional impulses resulting from the intensity of his suspicions or beliefs.

Dr. Kelleher, a psychiatrist, then testified for the State as its expert witness. In response to the prosecutor's hypothetical question, Dr. Kelleher was of the opinion that, under the totality of the circumstances, the hypothetical person was not suffering from any mental defect or mental disease, but merely from a personality disorder; he was suffering from an emotional reaction, not from a neurotic depression. On cross-examination, defense counsel first asked for Dr. Kelleher's opinion as to whether the hypothetical person could have been laboring under an insane delusion which constituted the mental disease or mental defect of paranoia. In Dr. Kelleher's opinion the totality of the circumstances did not warrant that finding. Dr. Kelleher defined an insane delusion as a persistent false belief having no basis in reality, which belief will nevertheless not yield to evidence of its falsity and to logical reason.

Dr. Reifman, a psychiatrist, was then called by defendant to testify

in "surrebuttal." In response to defense counsel's hypothetical question, the doctor stated that the facts upon which the hypothetical question was based were insufficient to enable him to form any opinion as to whether the hypothetical person was suffering from any mental disease or mental defect. On cross-examination and then on redirect examination, Dr. Reifman had occasion to discuss the matter of insane delusions. While an insane delusion indicates mental illness and an impairment of judgment, the doctor was unable to form an opinion as to whether the hypothetical person was laboring under an insane delusion because of insufficient facts in the hypothetical question. A person laboring under an insane delusion might or might not be able to appreciate the criminality of his conduct. A delusion is defined as a belief which would not be deemed factual by one's peers. The deluded person is suffering from a mental disease called paranoid schizophrenia. Paranoia is a break away from reality to such a degree as to indicate a mental illness.

The trial court itself questioned both Dr. Kelleher and Dr. Reifman as to whether the hypothetical person could have been laboring under an insane delusion at the time of the shootings. The trend of the court's questioning clearly indicates that the court, working from the definitions of Dr. Kelleher and Dr. Reifman, could not understand how, in view of what the hypothetical person was proved to have personally observed on the night of the shootings and before the shootings occurred, the hypothetical person's belief as to the existence of a romantic relationship between his wife and Mr. Taylor and as to her pregnancy by him could possibly constitute an insane delusion. Later, in finding that the State had proved beyond a reasonable doubt that defendant was not insane at the time he committed the charged murder, the trial court, for the reason just stated, expressed its opinion that the said belief could not have constituted an insane delusion.

With the above preamble, I wish to make the following observations.

(1) The definition of an insane delusion, for the purpose of constituting a specific mental disease or mental defect as the basis for an affirmative defense of insanity in a criminal prosecution, should be the same definition as that used by Illinois courts in actions to contest a will on the specific ground of insane delusion, as distinguished from the ground of general mental testamentary incapacity. In a will contest on the specific ground of insane delusion, general mental testimentary capacity is conceded; the attack is focused solely on the existence of a belief on the part of the testator which has caused the testator to include or to omit a testamentary donative provision which he would otherwise have respectively omitted or included. In these will contests, an insane delusion is defined as a false belief entertained by the testator which is

not supported by any shred of evidence and which no rational person, in the absence of evidence, would believe to be true. (*Sterling v. Dubin* (1955), 6 Ill. 2d 64, 77, 126 N.E.2d 718; *Ryan v. Deneen* (1940), 375 Ill. 452, 457, 31 N.E.2d 582.) The egregious falsity of the belief is not the crucial factor; rather, the crucial factor is that the belief is not supported by any shred of evidence whatsoever.

Under that definition, the State in the instant case might contend that defendant's belief as to a romantic relationship between his wife and Mr. Taylor and as to her pregnancy by him was not an insane delusion because it was supported by a shred of evidence, namely, defendant knew that his wife had separated from him and was considering filing for a divorce. From this evidence, defendant suspected and believed that his wife was romantically involved with another man who was Mr. Taylor, for which reason defendant, a few hours before the shootings, announced his intent to kill both his wife and Mr. Taylor. Since, however, at the time defendant first expressed his belief, there was no shred of verified evidence that another man was involved or that Mr. Taylor was that other man, defendant might contend that his specific belief, as initially formulated and expressed, was an insane delusion.

(2) Whether or not defendant's belief, as *initially* formulated and expressed was an insane delusion, the trial court clearly was of the opinion that the belief was not an insane delusion *at the time of the shootings* because it had then been confirmed by at least a shred of evidence, namely, the verified personal observations of defendant on the night of, but prior to, the shootings. Whether a belief which, when initially formulated and expressed, is an insane delusion can then lose its character as an insane delusion by reason of a *subsequent* shred of evidence which logically confirms that belief is a theory which, in my opinion, need not be, and is not, decided by the opinion of the court in this case.

(3) While I can find no Illinois criminal case which has dealt with the defense of insanity at the time of the offense by reason of the specific mental disease or mental defect of insane delusion, decisions in a few other States have done so. *Mullins v. State* (1960), 216 Ga. 183, 115 S.E.2d 547; *Coffee v. State* (1944), 148 Tex. Crim. R. 71, 184 S.W.2d 278; *Kennamer v. State* (1936), 59 Okl. Crim. 146, 57 P. 2d 646; *Horn v. Commonwealth* (1942), 292 Ky. 587, 167 S.W.2d 58; *State v. Green* (1931), 78 Utah 580, 6 P. 2d 177; *Kraus v. State* (1922), 108 Neb. 331, 187 N.W. 895. See also 40 C.J.S. *Homicide* §267, at 1217 (1944).

All of these States require that the defendant must make a showing that (a) he was actually laboring under an insane delusion at the time he committed the offense for which he is being prosecuted, and that

(b) the said offense was the result of that insane delusion. Precisely how the defendant is to make the showing that he was laboring under an insane delusion at the time he committed the offense is not clear.

In five of these six States, there is a third essential element of the defense: the delusion must relate to a fact which, if true, would constitute legal justification for the criminal offense committed. The Nebraska case does not require this third essential element if the insane delusion was such that it prevented the defendant from mentally appreciating the criminality of his conduct. In the instant case, none of the expert witnesses was of the opinion that, even assuming that the hypothetical person shot the victims as the result of his insane delusion, the said insane delusion impaired his ability to appreciate the criminality of his conduct. Hence, under the test established in these other States for a successful defense of insanity based on insane delusion, the defendant must establish that his insane delusion would, if true, have constituted legal justification for the homicides. Under our Illinois statutory provisions in respect of legal justification (Ill. Rev. Stat. 1973, ch. 38, pars. 7—1 through 7—14), it is clear that defendant's belief in the instant case, even if assumed to be an insane delusion, would not, if true, have constituted legal justification for the homicides.