THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY DUNIGAN, Defendant-Appellant.

First District (5th Division)    No. 79-120

Opinion filed May 22, 1981.—Rehearing denied June 26, 1981.

James J. Doherty, Public Defender, of Chicago (John M. Kalnins and John Thomas Moran, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LORENZ delivered the opinion of the court:

Following a jury trial, defendant was convicted of attempt murder (Ill. Rev. Stat. 1977, ch. 38, pars. 8—4, 9—1), rape (Ill. Rev. Stat. 1977, ch. 38, par. 11—1), aggravated battery (Ill. Rev. Stat. 1977, ch. 38, par. 12—4) and burglary (Ill. Rev. Stat. 1977, ch. 38, par. 19—1). He was sentenced to concurrent terms of 6 to 18 years for the attempt murder of Agnes Silverstein, 100 to 300 years for her rape, 3 to 9 years for the aggravated battery of her husband, Leo Silverstein, and 5 to 15 years for the burglary of their apartment.

Defendant appeals and raises the following issues: (1) whether he was entitled to a substitution of judges after the judge had *ex parte* communications with government attorneys prior to trial and with the victims of the crime prior to sentencing; (2) whether the trial judge was required to recuse himself from hearing defendant's motion for substitution of judges; (3) whether the trial court properly restricted his access to intelligence information contained in the Chicago Police Department's "Red Squad Files"; (4) whether he was denied his constitutional rights to compulsory process and due process of law (U.S. Const., amends. VI, XIV), when the trial court quashed his subpoenas for evidence and denied him a continuance to prepare for his defense; (5) whether the trial court properly ruled that a lay witness could not render an opinion as to the existence of defendant's mental illness or defect; (6) whether the trial court erred in ruling that a lay witness could not offer an opinion as to defendant's sanity based upon observations 10 and 16 months after the crime; (7) whether the evidence at trial was sufficient to raise a reasonable doubt as to defendant's sanity and therefore justify the tender of an insanity instruction to the jury; (8) whether the jury was properly instructed on the "automatism" defense; (9) whether the trial court correctly found a lay witness incompetent to testify concerning defendant's ability to "formulate a conscious objective" and to perform "conscious volitional acts"; (10) whether the jury was properly instructed on defendant's theories of defense; (11) whether the trial court's oral directions to the court reporter to strike and to the jury to disregard evidence of defendant's sanity were required to be in writing; (12) whether the trial court erred in denying defendant's motion for a mistrial in response to certain notes from the jury during their deliberations; (13) whether defendant's sentence for rape is excessive. The relevant facts follow.

On Christmas morning, 1970, at about 11:30 a.m., Robert McPheterain, a doorman at the John Hancock Building in Chicago, was on duty.

He noticed a black man enter the lobby and approach the "marquee." The man wore a black "Zorro" hat, a black three-quarter length coat, a black vest, dark pants, black boots and wire rimmed glasses. He had a "fine" moustache and facial hair in the area of his chin. At trial, McPheterain identified a picture of defendant as the man he saw that morning.

The man examined the building directory for about 15 minutes, then dialed a number on one of the building phones. When McPheterain approached him, he requested entry to deliver a telegram to apartment 6808, the "Ethnic Press." McPheterain called the occupant of that apartment and was told not to admit the man unless he produced a telegram. The man fumbled through a small black book, but could not find the telegram, stating that he had apparently left it outside in the car. The doorman watched the man as he left the lobby and walked west on Delaware to Michigan, south on Michigan to Chestnut and then east toward Seneca. McPheterain testified that he knew this man was not the regular messenger for this building.

Later, at about 1 that afternoon, Leo Silverstein and his wife Agnes returned from Holy Name Cathedral to 860 N. De Witt, Chicago. They took the elevator to their apartment on the 19th floor. As they reached their apartment they were accosted by a black man carrying a black leather coat over his arm and wearing a large black hat. The Silversteins both identified this man in court as the defendant. He put a gun to the back of Leo Silverstein's head, and said "If you make any noise I'm going to kill you both." He then forced them into their apartment and closed the door, attached the chain, and removed his hat and glasses.

At gunpoint, he ordered them into the bedroom where he closed the door and pulled the shade. He ordered them to strip. Agnes Silverstein pleaded with the man to leave them alone. He told her husband to make her "shut up" or he would blow his head off and "put the brains" in front of her. He then hit her husband over the left eye. Then, he ordered him to lie on the floor on his stomach, and he tied his legs and his hands behind his back. As he was doing so, Agnes Silverstein attempted to grab the gun which had been placed on the bed. They struggled, but the assailant gained control of the weapon. He ordered her to lie down and he tied her hands together. As she lay a few feet away from her husband, the man raped her, taunting her husband with remarks like, "How do you feel somebody doing this to your wife, doesn't it make you sick," and "doesn't this make you want to fight."

After he finished the rape, he tied her feet together. He then ordered her and her husband to crawl to opposite sides of the bedroom. Then he replaced the bullet clip on his gun with a larger one and threatened to kill a lot of people if they were disturbed. Agnes Silverstein continued to

plead for their lives, but stopped when the man told her husband to keep her quiet. He struck her husband with his fist in the mouth and in the groin area.

The assailant asked Leo Silverstein his name and occupation. When he told him he was in the real estate business, the man asked why white people lived in high rise buildings and poor black people had to live in areas like Cabrini Green. When he discovered that Agnes Silverstein was German, he said that the only good thing Hitler did was to kill all the Jews. During this time, he spoke to them in a normal, conversational tone, and appeared cool and coherent. Then, the phone rang and he cut the telephone wires. He continued to beat them and pretended to stab Leo Silverstein in the head with a letter opener, but hit him in the chest instead with his fist and the handle.

He left and returned to the room several times. On one occasion he returned with roast beef from the kitchen. He ate several pieces of the meat which he cut off with a long knife, saying at the same time how he enjoyed it along with the jello he had found. Later, he came back with a bottle of Scotch. After drinking from the bottle he poured some over the victims. Then, he attempted to suffocate Agnes Silverstein with pillows, but was not successful. He drew swastikas on the bedroom mirror and circles on the door with lipstick and went through the pockets of their clothing, boasting that he had more money than they.

At about dusk, after he had been in the apartment for about four hours, he forced his penis into the woman's mouth. He then raped her again. Later, he punched her in the nose when he heard her talking, and stuffed a gag into her mouth. He tightened the bindings on her hands so that they cut into her flesh. He then rebound her husband's hands with a lamp cord. After putting on rubber gloves, the assailant wiped off various things in the apartment that he had touched. He also took a knife, grabbed her husband's penis and "massaged" it a little. Suddenly, he grabbed the gun and left the room.

He chased Agnes Silverstein, who had freed the ties from her feet and run out of the bedroom to the front door. She was unable to detach the chain, however, because her hands were so securely bound. The assailant was unable to pull her back to the bedroom because her husband had shut and locked the bedroom door, broken the window and called for help. The assailant told her he would kill her for this. She pleaded with him, but he shot her in the head behind the left ear. Although she was wounded and bleeding, she crawled to the bedroom, calling her husband and scratching on the bedroom door. He pulled her in, locked the door and cut the ties from her wrists.

At about 4:30 p.m. traffic patrolman Roland Harvey heard someone screaming for help. He saw a window shade flapping in a building on the

northwest corner of De Witt and Chestnut. He ran to the building, and with the doorman went to apartment 1902 where they gained entry by using the doorman's pass key. He saw large amounts of blood splattered on the walls and the floor of the apartment. A black hat lay on the floor near the bedroom door. Leo Silverstein was calling for help from the bedroom, but he would not open the door until he recognized the doorman's voice. When the door was opened they found Agnes and Leo Silverstein naked on the floor. There was a pool of blood near her head and her husband was also bleeding from the head. After he gave Officer Harvey a description of the offender, the Silversteins were taken to the hospital in an ambulance.

At about 6 a.m. the following day, Michael Motch, an area resident, noticed something "glittering". in an areaway between his building at 65 E. Oak Street and the adjoining building. He saw a 9-millimeter Browning automatic pistol with a long bullet clip lying under pieces of plywood. He turned the gun over to the police. Their investigation revealed that it was registered to defendant. A firearm expert's examination of this gun revealed that the loaded weapon's magazine carried 9 hollow-point bullets and one fully jacketed bullet. The bullet recovered from the Silverstein's apartment was a hollow-point bullet. However, it was too mutilated to determine whether it was fired from the recovered pistol. A cartridge casing recovered at the apartment, however, was found to have been fired from defendant's gun. None of the fingerprints found at the apartment matched those of defendant. Along with the fired bullet and cartridge casing, police recovered several knives, an ammunition clip, a small black notebook, a black hat, glasses and a black leather coat.

Subsequently, Leo Silverstein positively identified a picture of defendant from a number of photographs shown to him by the police. A warrant issued for defendant's arrest, but the police were unable to find him.

On July 12, 1976, Kurt Jensen, a police officer in Copenhagen, Denmark, arrested defendant there for having over-stayed his three-months visa. Defendant, who was using a Canadian passport under the name of "Lark Daniel Anderson" was deported to the United States and turned over to local authorities.

On August 9, 1976, both victims viewed a six man lineup and immediately recognized defendant as the person who had assaulted them.

The following evidence was introduced on defendant's behalf.

Patricia Brown met defendant in New York City in August or September of 1971 and knew him as "Billy Hinton." They had an "emotional" relationship and she was "in love" with him. During this relationship she testified that defendant complained of severe headaches, and would fall asleep afterwards for long periods of time. Defendant later

told her that he did not remember anything that happened during the headaches. He neither took medication nor saw a doctor for these headaches.

One evening in October of 1971, she had defendant and some friends over for dinner. He was particularly quiet that night and did not eat. After dinner, she found that defendant, who insisted upon doing the dishes, had swept everything off the kitchen table including the dishes, with his hand. When she screamed at him and asked what he was doing, he responded by screaming and banging his head against the wall. He then slept for 12 to 14 hours, and later only remembered the headaches.

In the spring of 1972, during a four-day sleepless period, defendant told her that he feared for her life and that the mob would "get" him. He also expounded on the evils of dope pushers. After these four days he slept for a long time after experiencing a headache. Defendant claimed that he only remembered the headaches. During their relationship, he was secretive about his past and never informed her of his wife and children. Defendant told her that he was a writer, and that he was running from "the mob".

Diane Pratt, an urban planner for the city of Chicago, testified that she met defendant late in 1968. At that time, he was lecturing with the Black Panther Party at Barat College in Lake Forest, Illinois. She was not romantically involved with defendant. After the deaths of Fred Hampton and Mark Clark, defendant's behavior changed. He started asking friends to sample his food and drink before him because the government was putting "dope" in them.

Early in December of 1970, she and defendant were at a party following a rally at a hospital at which defendant had given a speech requesting medical supplies. Shortly after the party started, he began to address the people at the party as if they were the hospital staff. When the people teased him, he called them greedy doctors and dope peddlers. Although defendant seemed coherent, his behavior was "totally out of context with the situation." Later, he seemed to be in pain. Biting on a handkerchief, he told her that he was having a headache. After sleeping, defendant had no recollection of the "speech" he had given at the party.

About two weeks later, Pratt met defendant at the Tap Root Pub with some other friends for dinner. He refused to accompany her inside, fearing "police spies". When she tried to persuade him to go in, he uncharacteristically jerked away very harshly. In her opinion, he had "a breakdown of some sort" and seemed "crazy and very disoriented." She thought he was insane and unable to conform his conduct to the requirements of the law.

Defendant testified in his own behalf. He was born in Chicago, and lived in the Cabrini Green housing project with his family from the time

he was 10 years old. He was an honor student at Waller High School and was not involved in gang activities. At the age of 14, his mother lost her eyesight, and he stayed home quite a bit to care for her and the children while his father worked.

In 1961 or 1963, defendant felt in jeopardy because of his race. His family would drive to Mississippi in the summer, and when they stopped at gas stations, his father's demeanor would change. Defendant was confused by this behavior at first, but later determined that people were different in Mississippi and that his father's actions were for his safety.

When he was about 19, he met the woman who was to become his wife. She became pregnant and they married against his family's wishes, since he felt that men should not abandon women. He quit school during his senior year of high school to get a job. Subsequently, he re-enrolled in school, passed the G.E.D test and worked for the Chicago Committee on Urban Opportunity. He enrolled in a work-study program at Northeastern University and worked as a cameraman.

Shortly after he joined the Black Panther Party in November of 1968, defendant and his wife agreed to separate for the safety of the family, and to move the children into his mother-in-law's house. He testified that he had some "interesting encounters" with the police around this time, including an incident that happened while walking from the subway with his wife. He was stopped by an unmarked squad car, handcuffed, placed in the car and then released a few blocks away.

Defendant was indicted with 16 other Black Panther members in the spring of 1969. He "wasn't clear" about the charges and was forced to go "underground" to avoid the police. At this time, defendant was "Captain of Security" of the Black Panther Party, a position he shared with William O'Neal. It was defendant's duty to protect the lives of the members of the central staff.

When he surfaced in May of 1970, he learned that his wife had become a heroin addict. The rules of the Black Panther Party were that drugs and intoxicants were forbidden. He shared this belief and fought against drugs and drug dealing in the community. At this time, the Party had split into two factions, a militant group headed by O'Neal, and a reformist group which was working with the "breakfast for children" programs and with a medical center. Defendant was a member of the latter faction despite recruitment efforts by O'Neal to join the violent group. In about July of 1970, he purchased a 9-millimeter Browning automatic handgun to protect himself and his family from the police. During this period, O'Neal told defendant that drug dealers should be "hit" and gave him addresses where they lived. O'Neal pointed out to him the building at 860 N. De Witt and the Hancock Building, but did not mention apartment 1902, the Silversteins' home. Since he had his wife "to

deal with" and duties with the Party, defendant did nothing with O'Neal's information.

During December of 1970, defendant learned that his wife had contracted hepatitis from an unclean hypodermic needle, and placed her in the hospital. He did not visit her there because it was "not safe". Later, he learned that she died of an overdose of barbituates. He thought that he discovered her death on December 24, 1970, but did not go to her funeral or wake.

Defendant corroborated the testimony of Diane Pratt and Patricia Brown concerning his loss of memory after the incidents they described. He also did not remember being at the Silversteins' apartment and did not know whether he committed the acts with which he was charged. He only recalled being at a party Christmas day and having a "migraine." After Christmas, he stayed for several months in a basement apartment where "Mad Peter" lived. He was told about the incident in question when he lived in the apartment "on Willow, west of Sheffield." Two or three months after Christmas of 1970, defendant left Chicago using the names "Bobby Hinton" and "Lark Daniel Anderson."

Father Joachim Martorano, a former pastor of St. Dominick's Church located in the Cabrini Green area, testified that he knew defendant when he worked there from 1963 to 1973. Defendant's reputation for truthfulness in the community was good and he was respected and dependable. He saw defendant every few weeks in 1970, and found that his character "lent to being that of an arbitrator."

STIPULATIONS

It was stipulated that defendant was 29 at the time of trial; that his wife died at 8:50 p.m. on December 23, 1970, and that her death certificate admitted into evidence listed the immediate cause of death as "hepatitis, being insufficiency due to or as a consequence of hepatitis due to or as a consequence of barbituate intoxication self-induced." It was further stipulated that William O'Neal was an informant placed in the Black Panther Party during 1968 to 1970.

Further relevant facts are incorporated into the discussion of the issues raised on appeal.

## OPINION

Defendant first contends that the trial court erred in denying his motion for substitution of judges. The basis of this contention is that the trial judge should have recused himself after allegedly (1) participating in certain *ex parte* hearings prior to trial, and (2) socializing with the complainants between the jury's verdict and the sentencing hearing.

On February 1, 1978, defendant filed a motion for substitution of

judges under section 114—5(c) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1977, ch. 38, par. 114—5(c)), and further moved that the hearing on the motion be before another judge, since the trial judge would be called by the movant as a witness. The court denied defendant's second request, electing to preside at the hearing on the motion.

Defendant's motion and supporting affidavit by one of his attorneys, James Young, set out that on January 6, 1978, his attorneys had sub-poenaed the United States Attorney's Office and the Federal Bureau of Investigation for the production of William O'Neal, a former F.B.I. informant who was then a relocated Federal witness. During the week of January 16, 1978, Young received notice that the U. S. Attorney would move to quash the subpoenas in accordance with a memorandum of law attached to the motion. However, no memorandum was enclosed with the notice of motion, and none was in the court file.

At about 9:30 a.m. on January 24, 1978, when the attorney entered the chambers of the trial judge assigned to his client's case, he found Lorna Propes, the Assistant State's Attorney assigned to the case, John Gubbins, Assistant U. S. Attorney, and A. F. Di Lorenzo, an F.B.I. agent, in the room with the judge. Upon his entry into the chambers, the group's conversation abruptly ceased. Young informed Gubbins that the public defender's office had not received nor did the court file contain the memorandum of law referred to in his notice of special appearance. Gubbins tendered to counsel a copy of the memorandum, stating that it was the government's copy and that there were no other copies available for him or for his co-counsel. Young observed the trial judge reading a copy of the same memorandum.

At the hearing on the motion, Assistant State's Attorney Propes testified that Gubbins and Di Lorenzo came to her office on the morning in question and they proceeded to the chambers of the trial judge. After she introduced them to the judge, Gubbins handed a memorandum to him. Shortly thereafter, defense counsel entered the room.

Gubbins testified that minutes after he arrived at the chambers, he discovered that the judge had not received a copy of his memorandum with the appended applicable Federal regulations governing the testimony of Federal witnesses. Gubbins apologized, explaining that the copies had been mailed but not "routed" to the judge or the State's Attorney's Office. He tendered to the judge one of his few remaining copies. As the judge started reading the memorandum, defendant's attorneys walked in. At this point, Gubbins and the others had been in the chambers for about five minutes. According to both Gubbins and Di Lorenzo, the merits of the case were never discussed with the judge.

Young testified that he had previously received notice that a memorandum would be forthcoming concerning the motion to quash the

subpoena, but that he had not received it. He did not contact the State's Attorney's Office or the U. S. Attorney's Office to ask for it. Young conceded that he had no personal knowledge of the contents of any conversation prior to entering the chambers, only that one had ceased when he arrived.

The trial judge, declining to formally testify, stated for the record that there were no *ex parte* communications and no discussions of the merits of the case. As was the custom in his courtroom, the trial judge offered coffee to Gubbins and Di Lorenzo after being introduced to them. The trial judge did not read the memorandum tendered to him because he had insufficient time to do so. Finding that defendant's motion was dilatory and based on conjecture, the trial judge denied the motion on the grounds that he was not biased.

Illinois Supreme Court Rule 61 provides as follows:

> "*Ex parte communications*. Except as permitted by law, a judge should not permit private or ex parte interviews, arguments or communications designed to influence his judicial action in any case, either civil or criminal.
>
> A judge should not accept in any case briefs, documents or written communications intended or calculated to influence his action unless the contents are promptly made known to all parties."

Ill. Rev. Stat. 1977, ch. 110A, par. 61(c)(16).

Defendant relies upon this provision to support his claim that the trial judge improperly participated in a private interview with the government attorneys and accepted documents from them that were not promptly disclosed to his attorneys. Because of this alleged misconduct, defendant asserts that the trial court erred in denying his motion for substitution of judges.

■■ ■ A defendant moving for substitution of judges for cause has the burden of showing prejudice which would disqualify the judge. (*People v. Winchell* (1977), 45 Ill. App. 3d 752, 359 N.E.2d 487.) We believe that defendant has not met this burden under the facts of this case. First, according to the uncontroverted testimony at the hearing, there were no pretrial discussions between the trial judge and the others concerning the merits of the case. Defense counsel's suppositions that such a conversation had occurred prior to his arrival at the judge's chambers are not sufficient to warrant the judge's recusal. Moreover, we find that the memorandum was not secretly furnished to the trial judge in an effort to influence his actions. It was only through an administrative mishap that the defense counsel did not originally receive a copy of the memorandum. Gubbins had given Young notice that the memorandum would be filed, and tendered him a copy immediately upon discovering that he had not received one. Apparently, the trial judge began to peruse the memo-

randum handed him by Gubbins, but had no time to fully read its contents. However, regardless of whether the trial judge read the memorandum in part or in its entirety before defendant's attorneys arrived, its contents were not discussed and no efforts were made to conceal it from defendant or his attorneys. In short, defendant suffered no prejudice simply because the memorandum reached the judge's hands moments before his attorney received a copy. We now turn to the second incident allegedly requiring the trial court's recusal.

Prior to sentencing, defendant moved that the trial judge withdraw from any further proceedings in the case. The basis for this request was that the judge had "joined socially" with the victims of the crime on March 17, 1978, at a local tavern after a verdict had been reached. The trial court's recollection of the evening of March 17, however, sheds a different light on defendant's allegations. According to the judge, he stopped briefly at a local tavern at the invitation of one of the Assistant State's Attorneys after the return of the jury's verdict. While having a "tomato juice" the victims, Leo and Agnes Silverstein, stopped at his table for a few moments, discussed "generalities" and then left. The judge did not know that the Silversteins would be at the tavern that evening, and stated that he did not discuss defendant's sentence or the outcome of the case with them or with anyone else. One of the Assistant State's Attorneys also present verified that nothing was discussed concerning sentencing or the merits of the case.

Defendant asserts that the trial court's action in "socializing" with the victims indicated his bias toward defendant and mandated his recusal from the sentencing procedures.

A judge must make every effort to avoid the appearance of impropriety during his activities that may reflect on his judicial conduct. Supreme Court Rule 61(c)(23) plainly states:

> "*Social relations.* A judge should be particularly careful to avoid any action that tends reasonably to arouse the suspicion that his social or business relations or friendships influence his judicial conduct." (Ill. Rev. Stat. 1977, ch. 110A, par. 61(c)(23).)

Private communications with the public concerning a case are impermissible, since a defendant is unable to rebut information obtained from members of the public and considered by the judge. (*People v. Sumner* (1976), 40 Ill. App. 3d 832, 354 N.E.2d 18.) In this case, however, there was no evidence that the trial court considered or received any information from the victims at their brief, unplanned encounter. The question then becomes whether the trial judge was required to recuse himself by virtue of the meeting itself, in the absence of evidence that the case was discussed.

In *People v. Hicks* (1970), 44 Ill. 2d 550, 256 N.E.2d 823, *cert. denied*

(1970), 400 U.S. 845, 27 L. Ed. 2d 81, 91 S. Ct. 90, a person intended to be called by the prosecution as a "life and death" witness in defendant's murder trial went to the judge's chambers on her own volition and requested to sit in the front of the courtroom for a suppression hearing. Prior to this occurrence, the person had voiced objections to a delay when a continuance had been granted defendant, and expressed doubt that justice would be served. This person was not called by the prosecution to testify at trial. Defendant's motion for a substitution of judges on the grounds that the judge was unduly "familiar" with, and "intimidated" by, the prospective witness was denied.

The Illinois Supreme Court in *Hicks* held that the judge's conversation with the person (who was also alleged to be a relative of the homicide victim) did not supply cause for his disqualification or give rise to the probability of unfairness which might affect the trial. The court stated:

> "To say that any involuntary meeting or conversation, no matter how trivial, gives rise to cause for disqualification would present too easy a weapon with which to harass the administration of criminal justice and to obtain a substitution of judges." *Hicks*, 44 Ill. 2d 550, 557, 256 N.E.2d 823, 827.

■■ We likewise believe that the involuntary meeting that occurred between the judge and the victims of the crime did not, in itself, disqualify him from presiding at the sentencing hearing. Our review of the record reveals no malice directed toward defendant by the trial judge as a result of his contact with the Silversteins, and it is unlikely that this single event resulted in such an increased level of emotional involvement as to make prejudice likely and disqualification necessary.

■■ Without citation to any published opinions, defendant contends that the trial court erred in refusing to appoint another judge to hear the motion for substitution of judges at the time of the first motion. Basically, defendant argues that he was deprived of the right to a fair and impartial hearing in that the judge's version of the incident that transpired in his chambers prior to trial was not made under oath and subject to cross-examination. Pointing to discrepancies in the judge's statement and the testimony of Gubbins concerning the judge's knowledge of the memorandum's contents, defendant states that this "sharply disputed" incident had to be resolved by another judge.

■■ At the time of trial, the statute governing the requirements for the substitution of judges "for cause" provided in part, that, "Upon the filing of such motion *the court* shall conduct a hearing and determine the merits of the motion." (Emphasis added.) (Ill. Rev. Stat. 1977, ch. 38, par. 114—5(c).) The reason for this rule is that the court itself is in the best position to determine whether it may be prejudiced against the defendant. (*People v. Campbell* (1975), 28 Ill. App. 3d 480, 328 N.E.2d 608.)

Here, the trial judge determined that he was not prejudiced and had no preconceived notions about defendant, and properly denied his request for another judge to preside at the hearing. Furthermore, we find the discrepancies between Gubbins' and the trial judge's statement regarding the reading of the memorandum to be of no consequence. Simply stated, there is no prohibition against the reading of such a document in the momentary absence of all parties, especially since a copy was promptly turned over to defense counsel, and no conversation was had as to its merits. Therefore, we reject defendant's contention since we know of no authority requiring that such information be tendered to defense counsel and the trial judge at precisely the same time.

Defendant next contends that the trial court erred in denying his motion for production of the "Red Squad Files" of the Chicago Police Department which dealt with surveillance of the Black Panther Party, of which defendant was a member.

On December 27, 1977, defendant filed a *pro se* discovery motion requesting a "complete investigation of and full disclosure of all materials pertaining to him and his activities while associated with the Black Panther Party," along with "other materials pertaining to his exercise of his First Amendment rights which are contained in the * * * so called 'Red Squad Files.' " Defendant asserted that these files were relevant since they might contain information regarding his whereabouts on the night of the crime. The trial court ordered the State to determine whether the files existed, and to turn them over to defendant if relevant. If the State found the evidence irrelevant, an *in camera* determination would be made by the trial court.

On December 29, 1977, after a public defender was appointed to represent defendant, the request for discovery was renewed. In discussing the "Red Squad Files," one of the prosecutors stated that the files were then subject to a protective order issued in Federal court, and that access to them was severely limited. Nevertheless, the State pledged to attempt to arrange an inspection of the files, even though it did not plan to use any evidence from them.

On January 3, 1978, the State indicated that they had reviewed the files and found a statement about the warrant for defendant's arrest to be the only applicable mention of defendant; there was no information regarding surveillance of defendant, and nothing relating to his activities on the day of the crime. Three days later, the State reiterated this position, adding that defense counsel would be permitted the same opportunity to view those files.

On February 17, 1978, defendant stated that the files were relevant since they bolstered his claim of harassment as a Black Panther Party member, and that this constituted one of the "forces" which led to his

insanity. The trial court made an *in camera* inspection and found the files to have neither materiality nor relevancy to any possible defense, and denied defendant's motion to have the contents disseminated.

■■ Defendant now maintains that the trial court erroneously denied him access to the files in violation of Supreme Court Rule 412(i), which states:

> "*Denial of disclosure.* The court may deny disclosure authorized under this rule and Rule 413 if it finds that there is substantial risk to any person of physical harm, intimidation, bribery, economic reprisals, or unnecessary annoyance or embarrassment resulting from such disclosure which outweighs any usefulness of the disclosure to counsel." (Ill. Rev. Stat. 1977, ch. 110A, par. 412(i).)

Defendant argues that the trial court made no finding that disclosure would bring about one of the abovementioned occurrences and that the court therefore was without authority to employ the *in camera* inspection.

Obviously, defendant's argument is without merit since it presupposes that the material in question was "disclosure authorized under this rule," and was somehow relevant to his defense. Defendant did not sustain his burden of showing relevance or materiality at the trial court and offers no new grounds on appeal. As earlier stated, the trial court specifically found the files irrelevant to any of the possible theories of his defense. Defendant is entitled to material which tends to negate his guilt as to the offense charged, and to evidence material to the preparation of his case not covered by the rules. (Ill. Rev. Stat. 1977, ch. 110A, par. 412(c), (h).) In order to make this determination the trial judge was implicitly authorized to conduct the *in camera* inspection of the material in question. (*People v. Clark* (1977), 55 Ill. App. 3d 379, 370 N.E.2d 1111, *cert. denied* (1978), 439 U.S. 858, 58 L. Ed. 2d 165, 99 S. Ct. 173.) The court had no duty to state reasons for denying disclosure for one of the reasons under Rule 412 when such disclosure was never "authorized" under the rule in the first instance. Therefore, defendant's request for disclosure of the "Red Squad Files" was properly denied.

Defendant next contends that the trial court, in quashing his subpoena to produce William O'Neal and various documents, along with denying him a continuance to obtain certain information under the Freedom of Information Act, deprived him of his constitutional rights to compulsory process and due process of law. (U.S. Const., amends. VI, XIV.) We reject this contention.

On December 29, 1977, defendant requested the current address of O'Neal, the Federal agent, "who was active in the Black Panther's at this period." Defendant also maintained that O'Neal was an informant. The State represented that O'Neal was neither an informant nor a prosecution witness in the case and that no evidence would be adduced from any

informants in defendant's trial. When requested by the trial court to explain the relevance of O'Neal's testimony in "nonconclusionary terms," defense counsel stated that O'Neal resided with defendant and had "access to great amounts of the defendant's personal goods and property." Another reason offered for his required presence was that he was an "agent provocateur" of the Federal Government and could provide information as to his activities with the Black Panthers and his communications with the Federal Government. The trial court, noting that O'Neal was under Federal, not State control, found that defendant had not established a sufficient factual premise to produce the witness.

Subsequently, defendant renewed his request for O'Neal's presence on the grounds that he could testify to certain "indices" of his behavior, since defendant had no recollection of the events surrounding the crime. As a government agent, O'Neal would allegedly have more credibility than others called on defendant's behalf. The trial court found that the witness had no connection with the State, was not listed in any police reports, and denied the request for his production.

Defendant issued subpoenas to the United States Attorney and to special agents of the F.B.I. demanding the production of O'Neal. In arguing that the subpoenas should be quashed, Assistant U. S. Attorney Gubbins mentioned that the Federal Rules prevented testimony or disclosure of Federal files unless the Attorney General approved that disclosure. The trial judge quashed the subpoenas, ruling that defendant's assertion that O'Neal would be a more credible witness than others was speculative.

On February 8, 1978, Gubbins offered to submit interrogatories to O'Neal in the event that he might contact the U. S. Attorney's office. This offer was made in an effort to aid the court in determining the materiality of O'Neal's testimony. O'Neal was not, according to Gubbins, in the control of his office. In addition, Gubbins stated that O'Neal could not attend court because he had "a number of threats on his life." Defendant rejected this offer, demanding O'Neal's presence in court. Further attempting to secure O'Neal's presence, defendant subpoenaed Marlon Johnson, former Chicago Area Director of the F.B.I., William Beane, of the F.B.I., and Thomas Sullivan, U. S. Attorney, and requested all materials concerning surveillance of the Black Panther Party dealing with O'Neal and defendant. He also requested a stay in the proceedings since his request for information similar to the subpoenaed material under the Freedom of Information Act would be complied with in four to six months. This request was denied by the trial court.

On March 15, 1978, a hearing was held on a motion to quash the subpoenas. The trial court quashed the Johnson subpoena because he was no longer an F.B.I. agent and had no access to any documents. The Beane

and Sullivan subpoenas were likewise quashed, the trial court finding that each had no authority to turn over the documents.

■ A court violates an accused person's right to compulsory process and to fundamental fairness at his trial when it denies him the ability "to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense." (*Washington v. Texas* (1967), 388 U.S. 14, 23, 18 L. Ed. 2d 1019, 1025, 87 S. Ct. 1920, 1925.) However, unless the witness denied to the defendant could have provided relevant and material testimony for his defense, there is no constitutional violation. *United States v. De Stefano* (7th Cir. 1973), 476 F.2d 324.

We find no constitutional violation by the trial court in denying the production of O'Neal. Defendant never provided a factual premise establishing the witness' relevancy or materiality. The record shows that O'Neal simply had no connection with the case. As to defendant's beliefs that the witness might have offered observations of defendant's bizarre behavior that would support an insanity defense, we find that this belief is based on conjecture, since defendant had no recollection of these events or by whom they were witnessed. Further, defendant made no showing that these observations may have occurred on or near the day of the crime. In addition to the grounds already discussed, defendant suggested that O'Neal's testimony would be relevant because it could: (1) provide information about defendant's flight which might negate circumstantial evidence of defendant's guilt; (2) establish that he supplied defendant's wife with drugs which resulted in her death by overdose; and (3) show that O'Neal encouraged defendant to "hit" drug dealers living in the victim's building. Each of these grounds provides no support for the production of O'Neal. First, the record does not support defendant's vague assertion that O'Neal could provide evidence surrounding defendant's flight. Second, the unsupported allegations with regard to supplying drugs to defendant's wife, even if true, were irrelevant to defendant's sanity since he was unaware of them at the time of the crimes. Third, there was no evidence that O'Neal told defendant that the victims were drug dealers. Therefore, O'Neal's production was not warranted. The trial court also properly ruled that the defense could not argue to the jury that O'Neal had crucial exculpatory knowledge and had been associated with and had received money from the Federal Government. The stipulation informing the jury that O'Neal had been an F.B.I. informant working with the Black Panther Party sufficiently explained his peripheral ties to the case.

Defendant claims that the trial court made a contradictory finding since it "conceded" that O'Neal's testimony would be relevant, yet found that he need not be produced.

After viewing the passage cited by defendant in support thereof, we believe that the trial court was merely rejecting defendant's theory that O'Neal's testimony was admissible solely on grounds that it would be "more credible" than that of others. The court repeatedly indicated that O'Neal's testimony was inadmissible on relevancy grounds, and never conceded that it would be proper.

Turning to defendant's related request for materials concerning surveillance of the Black Panther Party and defendant, we find that the trial court correctly quashed the subpoenas.

■■ A subpoena for documents will be quashed if the requesting party fails to show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition". *United States v. Nixon* (1974), 418 U.S. 683, 699-700, 41 L. Ed. 2d 1039, 1058-59, 94 S. Ct. 3090, 3103.

Defendant did not succeed in showing that the government's files would contain evidence relevant to his defense. Compliance with defendant's subpoena would have required the voluminous production of irrelevant evidence dealing with activities of the Black Panther Party having no connection whatsoever with defendant or the crime in question. Defendant's speculation that these files would aid his defense amounted to nothing more than a general "fishing expedition." Furthermore, defendant's allegations of "harrassment" contributing to his mental condition could have been proven by his testimony or by that of other Black Panther Party members. We also find that the urgency of defendant's request for these files and for the production of O'Neal is belied by his rejection of the offer of the U. S. Attorney's Office to submit interrogatories to O'Neal to discover the materiality of his testimony, and by his failure to accept their offer of Federal documents relating to defendant with "third party" information deleted.

Defendant's remaining contention along these lines deals with the trial court's denial of his four- to six-month continuance to seek information under the Freedom of Information Act similar to the subpoenaed information. A brief review of the procedural history of this case is appropriate.

The crimes for which defendant was convicted occurred on December 25, 1970. A finding of probable cause was rendered on August 12, 1976, following defendant's deportation to the U. S. from Copenhagen. After 10 court appearances, defendant elected to appear *pro se* on March 31, 1977, and the public defender was appointed to assist in an advisory

capacity. On December 27, 1977, the State requested a trial date, noting that defendant, who had been in custody for a year and a half, was not ready for trial. At this point, pursuant to defendant's request, the public defender was appointed to represent him.

On February 8, 1978, defendant requested a stay in the proceedings for four to six months until the Federal Government complied with his freedom of information request. The trial court denied this request. Subsequently, defendant's requests for a stay in the State supreme court and Federal district court were also denied.

■■ Granting a continuance to permit the preparation of a case rests within the trial court's discretion and will not be disturbed on review unless this discretion is abused. (*People v. Hayes* (1972), 52 Ill. 2d 170, 287 N.E.2d 465; *People v. Smith* (1980), 88 Ill. App. 3d 897, 410 N.E.2d 973.) In making this determination, the trial court may review the history of the case (see *People v. Hobbs* (1975), 35 Ill. App. 3d 29, 340 N.E.2d 601) and consider the diligence shown by the moving party. (Ill. Rev. Stat. 1977, ch. 38, par. 114—4(e).) Furthermore, the denial of a continuance does not constitute error unless it has embarrassed defendant in the preparation of his case and has thereby prejudiced him. *People v. Sedlacko* (1978), 65 Ill. App. 3d 659, 382 N.E.2d 363.

■■ We find that the trial court did not abuse its discretion in this case. At the time of the request for the stay, defendant had been in custody for about one and one half years. Defendant, despite admonishments from the trial court, insisted upon representing himself for nine months. Before this time, he had been represented by several attorneys for about six months. Defendant only asked for discovery in December of 1977, when the trial court indicated a desire to set a trial date. His attorney from the public defender's office had been appointed in an advisory capacity for about 10 months when the stay was requested. Given the long history of delays in this case, we believe that defendant had ample time to prepare his defense. No purpose would have been served by postponing the proceedings for a lengthy period. Furthermore, we have already decided that defendant failed in his burden to show that the requested information was relevant or material to his defense. Therefore, he suffered no harm in the denial of his request for a continuance or stay to obtain the desired documents.

Defendant next contends that one of his witnesses, a lay person, was improperly precluded by the trial court from rendering an opinion as to whether defendant suffered from a mental illness or defect in December of 1970.

Diane Pratt, an urban planner and an acquaintance of defendant, testified at trial as to certain observations of defendant during their two-year friendship. During direct examination, she was asked the following

question by defense counsel: "In your opinion, at that time was he suffering from a mental illness or defect?" The prosecutor's objection to the question was sustained.

■■ ■ It is well established that a non-expert witness who has had an opportunity to observe the subject under inquiry may give an opinion as to defendant's sanity—at the same time stating the facts and circumstances as the basis for the opinion. (*People v. Pruszewski* (1953), 414 Ill. 409, 111 N.E.2d 313; *People v. Patlak* (1936), 363 Ill. 40, 1 N.E.2d 228.) However, the question posed by defense counsel in this case was objectionable since it exceeded the ambit of merely seeking a lay witness' opinion concerning defendant's sanity. In *People v. Lechner* (1976), 35 Ill. App. 3d 1033, 342 N.E.2d 820, the court found a similar question objectionable, stating: "Not only was this a leading question, but in order for a witness to give an accurate response, a certain level of medical knowledge and familiarity with psychiatric terminology would be required." (*Lechner*, 35 Ill. App. 3d 1033, 1040, 342 N.E.2d 820, 825.) The witness here possessed no such medical knowledge. Moreover, the witness was allowed to testify to the incidents occurring during her contacts with defendant that provided the basis for her opinion as to his mental condition. She also opined that defendant was unable to conform his conduct to the requirements of the law. Therefore, the absence of the opinion drawn from such testimony is immaterial. See *People v. Kuntz* (1977), 52 Ill. App. 3d 804, 368 N.E.2d 114.

Defendant further contends that the trial court erred in excluding the testimony of another lay witness, Patricia Brown, concerning her opinion of his sanity.

Without detailing the particular testimony, we note that Brown testified to observation of defendant concerning events that occurred in October of 1971 (when defendant claimed headaches and threw dishes on the floor) and in spring of 1972 (when defendant expressed fears that the "mob" was after him). These incidents transpired approximately 10 and 16 months, respectively, after the crime.

■■ The insanity of a person either before or after the commission of a crime cannot excuse the crime; only insanity existing at the very time of the crime can excuse the same. (*People v. Count* (1969), 106 Ill. App. 2d 258, 246 N.E.2d 91.) In *People v. Yates* (1978), 65 Ill. App. 3d 319, 382 N.E.2d 505, the court held that a doctor's trial testimony concerning his examination of decedent was not probative of his mental condition at the time of the offense. The examination was taken six months prior to her death and was therefore too remote in time from the occurrence. The court in *Yates* relied upon *People v. Davidson* (1967), 82 Ill. App. 2d 245, 249, 225 N.E.2d 727, where it was held that a psychiatric examination of defendant performed about four months after the occurrence—"long

after the homicide"—could not, by itself, be a proper basis for the doctor's opinion as to defendant's condition on the day of the crime. Whether or not sufficient facts and circumstances have been testified to by a lay witness to serve as a foundation for that witness' opinion of the accused's sanity is primarily a question for the trial court to determine, and a reviewing court will not reverse this determination unless there has been an abuse of discretion. *People v. Lechner* (1976), 35 Ill. App. 3d 1033, 342 N.E.2d 820.

■■ In the present case, we cannot say that the trial court abused its discretion in refusing to permit Patricia Brown to give an opinion as to defendant's sanity when her observations of him took place long after the offenses. The court properly ruled that the events were too remote in time to be relevant to defendant's mental condition in December of 1970.

Defendant next contends that the trial court erred in refusing to instruct the jury on the insanity defense.

■■ All persons are presumed to be sane. (*People v. Smothers* (1973), 55 Ill. 2d 172, 302 N.E.2d 324.) The exculpating defense of insanity is an affirmative defense. (Ill. Rev. Stat. 1977, ch. 38, par. 6—2.) An affirmative defense, according to statute, must be raised by defendant through the presentation of "some evidence" unless prosecutional evidence has first called it into issue. (Ill. Rev. Stat. 1977, ch. 38, par. 3—2.) Our supreme court has interpreted "some evidence" under the insanity defense to be evidence which raises a reasonable doubt concerning the accused's sanity. (*People v. Redmond* (1974), 59 Ill. 2d 328, 320 N.E.2d 321.) If evidence is presented sufficient to create a reasonable doubt of sanity, the burden shifts to the State to prove beyond a reasonable doubt that the accused was legally sane at the time the offense was committed. (*People v. Martin* (1980), 87 Ill. App. 3d 77, 409 N.E.2d 114.) The Criminal Code of 1961 provides the following definition of insanity:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease of mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill. Rev. Stat. 1977, ch. 38, par. 6—2.

Given this background, we must review the record to determine if evidence sufficient to raise a reasonable doubt as to defendant's sanity was presented which required the submission of this issue to the jury.

■■ Defendant first argues that the "bizarre" nature of the incident itself provided sufficient evidence to allow the jury to determine the insanity issue. Briefly, he asserts that his actions at the scene of the crime

sufficiently manifested conduct indicative of his unsound mind. We disagree.

In our opinion, defendant's actions shortly before, during, and after the commission of the crimes reveal a planned, deliberate scheme that was performed in an effort to avoid apprehension. Such behavior, of course, has particular relevance to a defendant's sanity. (*People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) Initially, defendant employed deception when attempting to gain entrance to apartments in the John Hancock Building. After entering the lobby, he looked at the directory, dialed a number on the lobby telephone, and told the doorman that he had a telegram to deliver. When asked to produce the telegram, defendant feigned surprise and departed, claiming that he left it in the car. Leaving the building, he changed directions several times, apparently realizing that the doorman was watching him.

Later, when he confronted the victims outside their apartment, he pointed his previously concealed weapon at them, threatened to kill them if they made any noise and forced them into the apartment, closing and locking the door behind him. He then ordered them into the bedroom where he not only closed the door, but pulled the shades.

After forcing the two to strip, defendant bound them and raped Agnes Silverstein while taunting her husband. He separated the victims, and continually threatened, taunted and beat them throughout the afternoon. During the incident, he poured Scotch on them and boasted about how he enjoyed the food he had taken from their kitchen. To avoid detection, and prevent their escape, he tied their bonds tighter, cut the telephone wire, and wiped everything he had touched while wearing rubber gloves that he had brought with him.

Defendant fled only upon hearing Leo Silverstein break a window and call for help after Agnes Silverstein was shot. He discarded his gun a few blocks away.

According to both victims, defendant appeared to be cool and coherent during the incident. For example, when he spoke to them he did so quietly, so that one victim could not hear the conversation between defendant and the other.

Based upon this scenario, we hold that a reasonable doubt of defendant's sanity was not raised by the evidence introduced by the State surrounding the commission of the crime. Although defendant's conduct was extremely heinous and could be deemed "bizarre," one could characterize almost any crime of violence as "bizarre." The evidence surrounding the crime was insufficient to raise a reasonable doubt as to sanity. See *People v. Jackson* (1978), 57 Ill. App. 3d 809, 373 N.E.2d 583.

Defendant asserts that the testimony of Diane Pratt and Patricia

Brown sufficiently placed the question of his sanity within the province of the jury.

As to Brown, we have previously decided that her observations were properly found by the trial court to be too remote to be relevant. We therefore turn to the testimony of Pratt.

Pratt testified that in late 1969, defendant's behavior changed. Suddenly, defendant felt that the government was trying to poison his food. He therefore had other people sample it before eating. At a party in early December 1970, he delivered a speech addressing the guests there as if he were speaking to the hospital staff to whom he had earlier spoken. Later that evening, he claimed a headache and bit on a handkerchief in pain. He fell asleep, but upon awakening stated that he recalled nothing of the incident.

About two weeks later, defendant refused to accompany Pratt into the Tap Root Pub, saying he feared police spies. He roughly jerked away from her when she tried to persuade him to go inside. In her opinion, defendant was insane and unable to conform his conduct to the requirements of the law. According to her testimony, he had a "breakdown of some sort" and seemed "crazy and very disoriented."

Defendant testified to his memory loss on those occasions and added that he did not remember what had happened on the day of the crime. However, no medical evidence was offered as to his mental condition on the day of the crimes.

We do not believe that evidence offered on defendant's behalf raised a reasonable doubt concerning his sanity. Testimony that a defendant's conduct was disturbing or "bizarre" falls short of portraying a serious mental condition or a substantial history of mental illness. (*People v. Varnado* (1978), 66 Ill. App. 3d 413, 384 N.E.2d 37.) Also, evidence of idiosyncratic behavior, irresponsible conduct, unrealistic judgments or the commission of atrocious crimes does not alone justify a reasonable doubt of sanity. (See *People v. Harrington* (1974), 22 Ill. App. 3d 938, 317 N.E.2d 161.) More specifically, it has been held that testimony that people were "out to get" defendant and that he experienced periods of memory loss does not properly present the question of his sanity to the jury. (*People v. Rivera* (1972), 7 Ill. App. 3d 983, 987, 289 N.E.2d 36, 39, *cert. denied* (1973), 412 U.S. 907, 36 L. Ed. 2d 973, 93 S. Ct. 2300.) Pratt's testimony, while illustrating antisocial behavior on defendant's part, does not speak to his conduct on the day of the crime. In addition, defendant's self-serving assertions of memory losses and severe headaches need not be believed. (See *People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979.) Therefore, we find that the evidence offered by defendant was insufficient to overcome the presumption of sanity, and the refusal of the

trial court to instruct the jury on the affirmative defense of insanity was not error.

Finally, we reject defendant's argument that the jury indicated to the trial court that it felt defendant was inane by virtue of a note it sent to the court during deliberations. The note stated, "Was there any testimony to indicate that the defendant sought help re: his physical and/or mental state (either before or after December 25, 1970)?" We cannot speculate that this note represented that a member of the jury felt that defendant was insane at the time of the offenses. It could have merely indicated a juror's curiosity with regard to defendant's alleged headaches. Patricia Brown's testimony established that he sought no medical aid for these headaches. In any event, our inquiry is directed to whether sufficient evidence was presented to mandate the tender of the insanity instruction to the jury. Since we have found the trial court's ruling was correct as a matter of law, the jury's conjecture as to irrelevant matters need not be considered.

Defendant next contends that the trial court erred in refusing to properly instruct the jury on the defense of automatism and also in improperly restricting the testimony of a defense witness concerning this defense.

Defense counsel indicated in opening statements that defendant would rely on the defenses of insanity and "state of mind." At the instructions conference, defendant submitted the following instruction:

"A person is not guilty of an offense unless with respect to each element described by the instruction defining the offense he acted while having one of the mental states described below:

(A) That the person acted intentionally.

(B) That the person knows or acted knowingly.

(C) That the person is reckless or acted recklessly."

The trial court rejected this instruction as well as a similar one defining the various mental states. The court also refused the following defense instruction:

"A person intends or acts intentionally, or with intent or with intent to accomplish a result or engage in conduct described by the instruction defining the offense when his conscious objective or purpose is to accomplish that result or engage in that conduct.

A person is not guilty of an offense unless he has one of the mental states of either intent, knowledge or recklessness."

The court, however, did tender to the jury upon defendant's request this instruction:

"A material element of every crime is a voluntary act."

Our supreme court has found that an automatism defense is available to a defendant who lacks the volition to control or prevent involuntary

acts—those bodily movements which are not controlled by the conscious mind. (*People v. Grant* (1978), 71 Ill.2d 551, 377 N.E.2d 4.) Such involuntary acts may include those committed "during convulsions, sleep, unconsciousness, hypnosis or seizures." (71 Ill.2d 551, 558, 377 N.E.2d 4, 8.) In *Grant*, defendant argued for the first time on appeal that the jury could not have determined that he possessed the requisite volition for criminal responsibility without having been informed of the defense of involuntary conduct through the Illinois Pattern Jury Instruction stating that, "A material element of every crime is a voluntary act." (IPI Criminal No. 4.14 (1968).) The court found that the insanity instruction tendered to the jury adequately drew their attention to the evidence regarding the defendant's ability to control or prevent his conduct. Therefore, the tender of instruction No. 4.14 was not required since it would not have framed the evidence more plainly. Whether the defendant's epileptic seizures (which allegedly led to his assault of a police officer) could be characterized as a mental disease or defect for the purpose of the insanity defense was never at issue. Consequently, the court held that the failure of the trial court to *sua sponte* instruct the jury on the defense of involuntary conduct was not error.

Defendant's claim to an automatism instruction was likewise rejected in *People v. Wirth* (1979), 77 Ill. App. 3d 253, 395 N.E.2d 1106. There, defendant tendered a non-IPI instruction raising the issue of automatism in an effort to prove that his conduct resulting in his prosecution for burglary was involuntary. The trial court gave the jury the same instruction requested by defendant on appeal in *Grant* (IPI Criminal No. 4.14) defining a voluntary act. At trial, defendant had offered expert testimony from a psychiatrist by way of hypothetical question that the hypothetical person "probably did have an acute organic brain syndrome" and could "conceivably" have been suffering from hypoglycemia at the time of the occurrence. He also might have been suffering "from acute emotional disturbance" and was markedly intoxicated. (77 Ill. App. 3d 253, 258, 395 N.E.2d 1106, 1110.) In rejecting defendant's contention that his specific automatism instruction was merited, the court ruled that there was no evidence at trial that defendant's hypoglycemia might or could have caused involuntary criminal behavior. The court stated:

"In the instant case, the defendant had no disease and his only problem was one of voluntary intoxication * * * [T]here is no actual evidence of any organic impairment of defendant at any time. The defendant's evidence consists simply of hypothetical speculation by a psychiatrist, clearly different from specific and positive testimony." *Wirth*, 77 Ill. App. 3d 253, 258, 395 N.E.2d 1106, 1110.

The supreme court in *Grant* apparently recognized that IPI Criminal

No. 4.14 is a proper instruction if the evidence supports the automatism defense. *Wirth* expanded upon *Grant* by finding that an automatism instruction need only be given when defendant offers evidence of his organic impairment which leads to involuntary criminal behavior.

■■ In the instant case, the court tendered to the jury the instruction implicitly found by the court in *Grant* to properly describe the automatism defense even though defendant here, as in *Wirth,* offered no psychiatric testimony of organic impairment rendering his conduct on the day in question involuntary. Therefore, we find that the trial court did not err in rejecting the non-IPI instructions offered by defendant on his theory of the case.

■■ Defendant complains that Diane Pratt, one of the defense witnesses, was improperly restricted from responding to defense counsel's questions as to whether defendant was able to either "formulate a conscious objective in regard to his behavior," or to engage in "conscious volitional actions" during the incidents she had observed. The prosecutor's objections to these questions were sustained by the trial court on the grounds that she was not qualified to answer them.

Pratt, a lay witness, was allowed to testify as to her observations of defendant's conduct. We believe that the trial court properly ruled that she was not competent to give an opinion concerning defendant's ability to formulate intent or to speculate about his thought processes. In *People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979, defendant sought to raise the defense of insanity in answer to the State's charge of burglary. He relied upon a psychiatrist's testimony based on an examination of defendant months after the crime. There was evidence that defendant suffered brain damage from an earlier accident and could be expected to have headaches, dizzy spells and blackout spells. Defendant told the psychiatrist that he had a headache while sitting on the steps of the burglarized building, and next remembered that he was inside when the police had arrived. The doctor testified that if defendant had a blackout, he would have operated on an "automated basis" and would not have been able to "consciously judge or evaluate what he was doing." (42 Ill. App. 3d 919, 920, 356 N.E.2d 979, 981.) He could not state with a reasonable degree of medical certainty whether this happened to defendant or if defendant told him the truth about the blackout. The only way he could have been certain whether defendant was experiencing a blackout "was to have observed him at that time or by receiving information from some professional person equipped to judge a blackout who did observe him." (42 Ill. App. 3d 919, 921, 356 N.E.2d 979, 981.) Certainly, if the qualified psychiatrist in *Jackson* was not able to testify as to whether defendant was experiencing a blackout and was in an automated condi-

tion, the witness here, who had no medical training, was unable to give such an opinion. She simply was not qualified to do so.

Defendant contends that the trial court, in refusing his requested jury instructions, left the jury with no issue to decide. Our previous discussion shows that the insanity instruction was properly refused. Additionally, the jury was appropriately instructed on the involuntary conduct defense even though evidence justifying it was meager.

■■ Defendant also contends that the trial court improperly instructed the jury orally, and not in writing, to disregard any evidence of defendant's insanity.

Prior to closing arguments, the trial judge stated to the jury: "the court instructs the court reporter to strike and the jury to disregard any questions and answers of any witness as to the question of sanity."

It is undisputed that jury instructions in criminal cases must be in writing. (Ill. Rev. Stat. 1977, ch. 110A, par. 451(c); Ill. Rev. Stat. 1977, ch. 110, par. 67(1).) Not every direction to the jury, however, is to be considered an "instruction" requiring written form. (See, *e.g., People v. Bydalek* (1942), 381 Ill. 330, 45 N.E.2d 849, where court's oral communication to the jury as to the form of verdict to be used held not to be error.) The oral "instruction" complained of in this case was not an "instruction" within the contemplation of the abovementioned statutes, but was merely an evidentiary ruling in the form of an admonishment. This admonishment was not given immediately after the testimony of each witness, since the court determined that the insanity instruction was not warranted only after all defense witnesses had testified. Regardless, we find that defendant suffered no prejudice from this oral direction since he would not have benefited if it was, indeed, given to the jury in writing.

Defendant next contends that the trial court erred in denying defendant's motion for a mistrial made after the jury sent out three notes during their deliberations indicating that they were "hopelessly confused" about the issues and instruction given them.

The jury's first note read as follows:

"Please advise us of what stipulation was stated by the Judge in regards to the testimony, re: Defendant's sanity stated this a.m., 3/17/78."

The court replied to this message by informing the jury that there was no stipulation and that the court had "instructed the court reporter to strike and the jury to disregard all witness' testimony as to their opinion as to sanity."

According to defendant, this direction contradicted the court's earlier admonishment to "the court reporter to strike and the jury to disregard any questions and answers of any witness as to the question of sanity."

Defendant's brief states: "With these two instructions, was the jury to disregard all evidence of insanity as first instructed, or only evidence of opinions?"

In our view, these directions were not contradictory. The judge's second command merely reiterated what was earlier stated to them in slightly different verbiage. Since the second response clarified the court's previous message—to disregard evidence of sanity—(since the issue had already been determined as a matter of law), there was no error in giving this response.

The second note stated:

> "Was there any testimony to indicate that the defendant sought help re: his physical and/or mental state (either before or after December 25, 1970)?"

The trial court's response was: "You have all the evidence, continue to deliberate."

■■ Initially, we note that this response was suggested by defendant's attorneys. When defendant's attorney acquiesces in or encourages the court to respond to a jury's question, defendant cannot assert that the court abused its discretion. (*People v. Callahan* (1974), 16 Ill. App. 3d 1006, 307 N.E.2d 188.) In addition, we have previously stated that this inquiry may have indicated the jury's desire for clarification of testimony rather than their confusion, since there was testimony that defendant sought no "help" for his headaches or problems with amnesia. These questions may have also indicated that the jury was considering the automatism defense and defendant's "physical and/or mental state," and how this affected the voluntariness of his conduct. Therefore, the court's response was proper.

The third note read as follows:

> "Although we have a definition of conduct, we find no reference of the word conduct in any of the instructions. Please elaborate."

Attached to the note was the previously tendered instructions stating: "When I use the word conduct, I mean an act or series of acts and the accompanying mental state." Defendant moved for a mistrial on grounds that the jury was totally confused and that they had received inadequate instruction on the defense theory of the case. The judge told the jury: "You have the law and instructions, you continue to deliberate."

■■ Once again, we note that the instruction was given to the jury at defendant's request, even after the court had properly denied his instruction containing the word "conduct." Therefore, he is estopped from now claiming that the instruction should not have been given. The jury was adequately instructed on defendant's theory of the case, and a further instruction elaborating on the word "conduct" would only have misled

them. Accordingly, the trial court did not err in instructing the jury to continue in their deliberations.

■■ Defendant's final issue on appeal is that his sentence of 100 to 300 years for the offense of rape is excessive, and indicates a lack of judicial impartiality.

Sentencing is a function of the trial court. We will not disturb the sentence given defendant by the trial court unless there has been an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In our opinion, defendant's sentence for rape was properly based upon the factors offered in aggravation and mitigation. Defendant, who had previously been convicted of battery, raped Agnes Silverstein twice on Christmas Day, 1970, while taunting her husband. Both were subjected to hours of physical and mental torture. His conduct was accurately described by the trial court as "vicious, cold and calculating." The record reveals no instances where the trial judge exhibited a lack of judicial impartiality. For these reasons, there was no abuse of discretion.

The evidence in this case overwhelmingly supports defendant's conviction for the brutal crimes he committed over 11 years ago. Defendant not only fled this country to escape prosecution, but, upon his forced return engaged in dilatory tactics to forestall his trial, unduly burdening the administration of criminal justice. Nevertheless, he was afforded a fair trial by the State, the trial court, and the 12 members of the community who sat in his judgment. We believe that defendant's rights to due process of law were not violated in this case, and have no reason to disturb the jury's verdict or the sentence imposed by the trial court.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.